No. 23-1978

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT
UNITED STATES OF AMERICA,

Plaintiff-Appellant,

MARY SEGUIN

v.

RHODE ISLAND DEPARTMENT OF HUMAN SERVICES in its official capacity; MICHAEL D. COLEMAN, DEBORAH A. BARCLAY in their individual and official capacities; Rhode Island OFFICE OF Child Support Services in its official capacity; KEVIN TIGHE, MONIQUE BONIN, FRANK DIBIASE, WENDY FOBERT, KARLA CABALLEROS, TIMOTHY FLYNN, LISA PINSONNEAULT, CARL BEAUREGARD, PRISCILLA GLUCKSMAN, JOHN LANGLOIS, PAUL GOULD, in their individual and official capacities; RHODE ISLAND STATE COURT SYSTEM in its official capacity; PAUL A. SUTTELL in his individual and official capacity as EXECUTIVE HEAD OF RHODE ISLAND STATE COURT SYSTEM; RHODE ISLAND ADMINISTRATIVE OFFICE OF STATE COURTS in its official capacity; RHODE ISLAND ADMINISTRATIVE OFFICE OF THE SUPERIOR COURT in its official capacity; RHODE ISLAND JUDICIAL COUNCIL in its official capacity; RHODE ISLAND SUPERIOR COURT in its official capacity; RHODE ISLAND SUPERIOR COURT JUDICIAL COUNCIL in its official capacity; THE JUDICIAL TECHNOLOGY CENTER in its official capacity; JULIE HAMIL, MARISA BROWN, JOHN JOSEPH BAXTER, JR., JUSTIN CORREA in their individual and official capacities; RHODE ISLAND OFFICE OF THE ATTORNEY GENERAL in its official capacity; RHODE ISLAND OFFICE OF THE ATTORNEY GENERAL OPEN GOVERNMENT UNIT in its official capacity; ADAM D. ROACH, PETER NERONHA in their official and individual capacities; TYLER TECHNOLOGIES, INC.; GERO MEYERSIEK

Defendants-Appellees.

Appeal from the United States District Court

for the District of Rhode Island

_____

## APPELLANT'S F.R.A.P 27(b) MOTION TO MODIFY OR CORRECT OR VACATE THE COURT'S FEBRUARY 16, 2024 ORDER

_____

Pursuant to Fed. R. App. P 27(b) and/or 1st Cir. Rule 27.0(d), Texas

Appellant, MARY SEGUIN, respectfully moves to modify or correct or vacate the

order entered by the Clerk of the Court pursuant to 1st Cir. Rule 27.0(d) in this

matter dated February 16, 2024 that states, "On November 20, 2023, plaintiff-

appellant Mary Seguin filed a pro se notice of appeal (D. Ct. Dkt. #38) in civil case

no. 1:23-cv-00126-WES (D. RI.), seeking to challenge the district court's

electronic order also entered November 20, 2023. That order stated that because of

plaintiff's appeal (No 23-1967) the district court had limited jurisdiction and would

resolve three pending motions filed on November 17, 2023 "when Plaintiff's appeal

is resolved." Upon review of the Case: 23-1978 Document: 00118109742 Page: 1

Date Filed: 02/16/2024 Entry ID: 6623392 record, it appears that a February 1,

2024 order did resolve the November 17, 2023 motions by denying them, so this

appeal may be moot. Therefore, it appears that there is no relief that this Court

could grant to appellant. See, e.g., Am. Inst. for Foreign Study, Inc. v. Fernandez-

Jimenez, 6 F.4th 120, 123 (1st Cir. 2021) ("we would be unable to grant [party]

any relief even if we ruled in his favor. Thus, his claim is moot."); Oakville Dev.

Corp. v. FDIC, 986 F.2d 611, 613 (1st Cir. 1993) ("It is well established that, in circumstances where a court cannot provide effectual relief, no justiciable case remains and the court must dismiss the appeal as moot."). The appellant is ordered to move for voluntary dismissal of the appeal pursuant to Fed. R. App. P. 42(b), or to show cause, in writing, why this appeal should not be dismissed for lack of jurisdiction. The failure to take action by March 1, 2024, will lead to dismissal of the appeal for lack of diligent prosecution. 1st Cir. R. 3.0(b)."

Appellant respectfully moves the Court to modify or correct or vacate the inaccurate part of the Order, so as to accurately reflect the record, namely that Appellant had filed a timely Rule 59 Motion in the early afternoon of November 16, 2023 and a Rule 60 Motion in the late afternoon of November 16, 2023. Judge Smith obstructed the district court clerk to docket these November 16, 2023 timely Rule 59 Motions in violation of Fed. R. Civ. P 79(a)(2) and 70(a)(2)(A) (motions to reconsider filed post-judgment within the 28 day period are considered Rule 59(e) motions, irrespective of how they are labeled).

The record shows that in the early afternoon of November 17, 2023, Judge Smith issued the first of the two denial TEXT ORDERS on the docket. Email correspondence sent by the Appellant to the district court shows that the clerk informed the Appellant that the Judge continued to instruct the clerks not to docket Appellant's motion filed with the clerk ( ECF 32, 32-1, 33, 33-1, 34-1, 35-1).

Subsequently, Appellant filed a Rule 60(b)(1) Motion moving the district court for relief from the obstruction of docketing Appellant's post-judgment motions. The record shows Appellant's November 17, 2023 Rule 60(b)(1) was also obstructed from being docketed by Judge Smith, after which Judge Smith issued the second of the two TEXT ORDERS dated November 17, 2023 also denying Appellant's Rule 60(b)(1) motion. Subsequent to the entry of the **second** denial TEXT ORDER dated November 17, 2023, Plaintiff-Appellant filed the November 17, 2023 Notice of Appeal (the only filing by Appellant between November 16th and November 17th that was docketed) docketed as ECF 32, ECF 32-1.

### A. Judge Smith Abuse of Office Violation of Fed. R. Civ. P 79 in the District Court for the District of Rhode Island Involving the Illegal Alteration of the Record in a Federal Court of Record in an Official Federal Proceeding

### (1) First Act of Alteration of the Record (Tampering) Through Abuse of Office Instructing the Clerk Not to Docket Timely Rule 59(e) Motions

This Court Order's characterization of the record and therefore the February 16th of 2024 Order's resulting conclusion is **not** supported by a *scrutiny* of the November 17, 2023 Notice of Appeal documents filed as **ECF 32, 32-1**. It is apparent by the Court's February 16th Order that this Court's Clerk performed a *cursory* review of the **docket entry cover-up revisions ordered by Judge Smith in his text order dated November 20, 2023 by which he directed the district clerks to entered into the docket** in violation of **Fed. R. Civ. P 79** and aimed to

*tamper with* the record and *muddy* the preserved evidence contained in Appellant's Notice of Appeal (ECF 32, ECF 32-1) that documents **evidence of Judge Smith instructing the district court district clerk on November 16, 2023 and on November 17, 2023 *not to docket*** Plaintiff-Appellant's timely written post-judgment Rule 59 and Rule 60(b) motion filings regarding the October 19, 2023 final judgment that were timely filed on **November 16, 2023**, as well as Appellant's November 17, 2023 post-judgment Rule 60(b)(1) motion also regarding the final judgment and Judge Smith's acts obstructing the docketing of Appellant's motion filings in violation of, *inter alia,* Fed. R. Civ. 79.  On November 16, 2023 **and again** on November 17, 2023, the two days in which Judge Smith instructed the clerk not to docket a total of three written motions Appellant filed with the clerk, especially Appellant's **timely November 16, 2023 Rule 59 and Rule 60(b) Motions,** Judge Smith knew or should have known that he violated with intent the following (non-exhaustive):

(1) Fed. R. Civ. P 79(a)(1)

(2) Fed. R. Civ. P 79(a)(2)(A)

(3) 18 U.S.C. § 2071(a)

(4) 18 U.S.C. § 1512(k)

(5) 18 U.S.C. § 371

(6) 18 U.S.C. § 241

(7) 18 U.S.C. § 242

(8) 18 U.S.C. § 1519

all of which evidence are preserved in the over 83 pages of ECF 32, 32-1 the November 17, 2023 Notice of Appeal, showing the email filing date-stamp of **November 16, 2023,** the date when Appellant timely filed and the clerk received Appellant's Rule 59 Motion and Rule 60(b) motion written filings – Plaintiff's Notice of Appeal dated November 17, 2023 is over 83 pages long, docketed as ECF 32, 32-1. Moreover, the several emails sent by the Plaintiff to the clerk of the district court between November 16, 2023 and November 17, 2023 show evidence of the aforesaid criminal obstruction and tampering of the court docket, detailing the many phone calls Plaintiff made from Texas to Rhode Island on November 16, 2023 and on November 17, 2023 to the Office of the Clerk demanding that the clerks follow the law to docket her electronically submitted motion "paper filings." Judge Smith knew and should have known that the effect of his obstruction of the docketing of Appellant's timely Rule 59(e) motions filed on November 16, 2023 erases/conceals from/alters the record evidence of the filing of a Rule 59(e) motion that critically suspends the finality of the October 19, 2023 final judgment and **Appellant's Rule 59 Motion raises multiple egregious issues that involve federal interstate criminal activity by the Defendants-Appellees into the record, *including, inter alia*, issues of _his_ disqualification**. In this Court of

Appeals, where the suspension of the final judgment starts with the filing of two timely Rule 59(e) motions ((Rule 59 and Rule 60 motions filed within 28 days are considered Rule 59(e) motions, *e.g.*, *See Mangieri v. Clifton*, 29 F.3d 1012, 1015 n.5 (5th Cir. 1994) ("A motion for reconsideration is deemed to arise under Rule 59 if filed within rule 59's . . . time limit regardless of the label applied to the motion." (internal quotations omitted)) ) filed on **November 16, 2023**)), this Texas Appellant hereby respectfully requests the Court of Appeals of the First Circuit to **<u>scrutinize</u>** the record for accuracy supported by record evidence of what happened, disturbingly in this case the commission of several crimes in which Judge Smith instructed the clerks to alter the court records that aids the abets the Appellees' criminal activities detailed in the Amended Complaint (ECF 25), in the district court below.  Appellant requests the modification of the February 16th Order to reflect that the Appellant filed two written motions, a Rule 59(e) Motion and a Rule 60(b) Motion, both of which were filed and received by the district court clerk on November 16, 2023.

## <u>Fed. R. Civ. 79</u>

The law of civil procedure aims to ensure the integrity of the record in a court of record, and this is no less so in Article III courts.  In relevant parts, Fed. R. Civ. P 79 states:

"Records Kept by the Clerk

(a) Civil Docket.

(1) In General. The clerk **must** keep a record known as the "civil docket" in the form and manner prescribed by the Director of the Administrative Office of the United States Courts with the approval of the Judicial Conference of the United States. The clerk must enter each civil action in the docket. Actions must be assigned consecutive file numbers, which must be noted in the docket where the first entry of the action is made.

(2) Items to be Entered. The following items must be marked with the file number and entered chronologically in the docket:

(A) papers filed with the clerk;"

The more than 83-pages November 17, 2023 Notice of Appeal ECF 32, 32-1 filed by the Appellant preserves documentary evidence of the multiple email correspondences and phone calls Appellant made to the clerk's office of the district court demanding that the clerk and Judge Smith follow the law of civil procedure and docket Appellant's papers filed with and received by the clerk on **November 16, 2023**. It is self-evident to the clerk of the district court and to Judge Smith that on November 16, 2023 and November 17, 2023, they _knowingly violated_ Fed. R. Civ. P 79 _three_ times, obstructing the docketing of "papers filed with the clerk" under Rule 79(a)(1) and Rule 79(a)(2)(A). Appellant's emails dated, sent and received by the clerk on November 16, 2023 clearly labeled the November 16, 2023 Rule 59 Motion and clearly recounted several phone calls to the clerk's office emphasizing Appellant's paper filings with the clerk are Rule 59 Motions. Appellant's follow-up emails on the morning of November 17, 2023 continue to

emphasize that her November 16, 2023-filed written/paper Motions are Rule 59

Motions.  On November 17, 2023 Appellant followed up her emails with another

phone call and was informed by the clerk that Judge Smith instructed the Office of

the Clerk not to docket Appellant's November 16, 2023 Rule 59 Motions.  Thus,

there is no ambiguity regarding Appellant's clear multiple explicit communications

by email and by phone to the clerk's office in Rhode Island that Appellant's

November 16, 2023 paper filings are Rule 59 Motions.

It is firmly established that the obstruction of docketing Appellant's timely

November 16, 2023 Rule 59 Motions was knowing and intentional.  Obstructing

the docketing of paper filings and the conspiracy to obstruct the docketing of paper

filings in a court of record in an official federal proceeding are criminal.

This very issue is preserved and is under appeal in the United States Court of

Appeal for the First Circuit.  *See* November 17, 2023 Notice of Appeal (ECF 32)

The November 17, 2023 Notice of Appeal (ECF 32) states on page 3 of 77

from paragraphs 2 to 5 the following, "2. Plaintiff respectfully requests the U.S.

Court of Appeals for the First Circuit to **review** Plaintiff's timely filed **Rule 59**

**Motion and Rule 60 Motion** that were filed in the U.S. District Court of the

District of Rhode Island on <mark>**November 16, 2023**</mark> as proper part of the record of

appeal. Prior to filing this Notice of Appeal, Plaintiff also filed a Rule 60(b)(1)

Motion regarding the ***District Court's interference*** with Plaintiff's **right to file Rule 59 and Rule 60** post judgement in which Plaintiff sought to **preserve <u>issues for appeal on the record.</u>** Plaintiff attaches all relevant documentation, including all relevant emails to the Clerk of the Court of the District Court and Plaintiff's properly filed post judgment motions pursuant to Rule 59 and Rule 60 herein to this Notice of Appeal and Docket Statement. 3. **Plaintiff's Rule 59 Motion was filed on <u>November 16, 2023</u>**, which the **District Court of Rhode Island *refused to docket on the record, pursuant to instructions by Judge Smith***. 4. **Plaintiff's first Rule 60 Motion was filed on November 16, 2023,** ***which the District Court of Rhode Island refused to docket on the record, pursuant to instructions by Judge Smith***. 5. Plaintiff attaches the aforesaid post judgment Motions and requests appellate review under these extraordinary and troubling factual circumstances that violate and obstruct the fundamental First Amendment right of access to the Court of Record, due process and obstruction to justice in the First Circuit, and inter alia, interference with the accuracy of the court's record for appeal in this matter."

Plaintiff-Appellant's Notice of Appeal (ECF 32, ECF 32-1) made clear in no uncertain terms that Appellant appeals the following:

(1) Judge Smith's denials of her timely-filed **November 16, 2023** Rule 59

Motion and Rule 60(b) Motion that **suspended** the finality of the

October 19, 2023 final judgment;

(2) Judge Smith's denial of Appellant's November 17, 2023 Rule 60(b)(1)

Motion that stated the following, "1. Plaintiff, proceeding from and as a

citizen of Texas, respectfully requests pursuant to Fed. R. Civ. P. Rule

60(b)(1), (3), (4) and (6) for a new trial. Judge Smith had obstructed

Plaintiff access to the Court, by instructing the Clerk of the Court,

Meghan, to not docket Plaintiff's timely filed **Rule 59 and Rule 60**

Motions filed with the Clerk via email on **November 16, 2023**, as to

obstruct Plaintiff's right to access the Court to preserve the issues for

appeal. Plaintiff avers the following, supported by affidavit attached: (1)

On November 16, 2023, at 1:31 PM Central Time, Plaintiff filed via

email to the Office of the Clerk In-Take email, Plaintiff's timely-filed

Rule 59 Motion, requesting a new trial as Rule 59(e) provides. Plaintiff

requested in her email that the Clerk timely docket the time‑sensitive

Rule 59 Motion on November 16, 2023. Plaintiff telephoned the Clerk's

Office twice on November 16, 2023 to make sure of the Clerk's receipt

of Plaintiff's filings, and was confirmed, and told that all motions

emailed to the Clerk's Office are docketed as filed on the date stamp

receipt by the Court's Clerk's Office. See attached email and email-attached Motion. (2) On November 16, 2023, at 4:39 PM Central Time, Plaintiff filed via email to the Office of the Clerk In-Take email, Plaintiff's timely-filed Rule 60(b) Motion, requesting a new trial. Plaintiff requested in her email that the Clerk timely docket the time-sensitive Rule 60 Motion on November 16, 2023. See attached email and email-attached Motion. (3) However, neither motions were docketed by the Clerk of the Court, and Plaintiff followed up first thing on November 17, 2023 at 8:00 AM Central Time. Plaintiff spoke to Clerk Meghan who informed Plaintiff that she had forwarded Plaintiff's Rule 59 and Rule 60 Motion to Chambers because the Court told her to, without docketing Plaintiff's Motions. Clerk Meghan told Plaintiff she will email Chambers to "find out what is going on." No Order in this matter requires Plaintiff to file for leave of Court to file any post judgement motions, and even if leave is required, Plaintiff's court-submitted Rule 59 and Rule 60 Motions seeking to preserve issues for appeal are required by law to be docketed in all courts of law to complete an accurate record for appeal. (4) Plaintiff expressed to Clerk Meghan Plaintiff's concern that the irregular forwarding of timely filed Rule 59 Motion and Rule 60 Motion languishing in Chambers without being docketed on the record adversely

impede and obstruct Plaintiff's right of access to the Court, as well as obstructs Plaintiff's right to preserve legal issues for appeal, and fabricating an inaccurate record for appeal, as well as violates due process. (5) At 12:20 PM, Plaintiff followed up by telephone, and was told that there were no updates from Chambers and Plaintiff's Rule 59 and Rule 60 Motions are still not docketed. Plaintiff emailed the Clerk's office documenting in writing the irregularity described above. At the very same moment, Judge Smith entered a text order stating that the Court is in receipt of two emails sent by the Plaintiff and construes them as motion for leave to file, that are denied. Plaintiff's Rule 59 and Rule 60 Motions continue to be not docketed. Plaintiff phoned the Office of the Clerk again, and the Clerk informed Plaintiff that the Court is telling her not to docket Plaintiff's Rule 59 and Rule 60 motions. This is prima facie judicial obstruction of Plaintiff's right to file Rule 59 and Rule 60 Motions against the Plaintiff to preserve issues on the record for appeal. Plaintiff attaches herewith the aforesaid November 17, 2023 email for the record. WHEREFORE, Plaintiff requests the Court to docket Plaintiff's timely filed Rule 59 and Rule 60 Motions and the aforesaid three emails to preserve the record accurately. Plaintiff requests the Court treat Plaintiff's timely filed Rule 59 Motion and Rule 60 Motion

filed on November 16, 2023 as timely filed. Plaintiff requests the disqualification of Judge Smith by the Court. Plaintiff requests any and all such relief deemed just under the circumstances."; Emphatically Judge Smith DENIED this motion on November 17, 2023 via his ***second*** of the two TEXT ORDERS entered on November 17, 2023 in the record.

(3) Judge Smith's unlawful instructions to the clerk of the court to obstruct the docketing of the Appellant's timely post-judgment November 16, 2023 Rule 59 and Rule 60(b) motions, and unlawful instructions to the clerk of the court to obstruct the docketing of the Appellant's November 17, 2023 Rule 60(b)(1) requesting relief from Judge Smith's criminal obstruction of docketing of Plaintiff-Appellant's court filings in a court of record in an official federal proceeding in federal court – emphatically, Judge Smith denied all three of Appellant's aforesaid motions via Text Order dated November 17, 2023 PRIOR to Appellant's filing of the November 17, 2023 Notice of Appeal appealing Judge Smith's **denial** Text Orders, which merge with the final judgment.

(4) Judge Smith's Text Orders' **pattern** of criminal attempt**s** to cover up his deliberate obstruction of a federal proceeding by characterizing Plaintiff-Appellant's timely and properly filed post-judgment motions as "motions for leave to file," which is utterly futile – *even* if this First Circuit Court

takes Judge Smith's transparent attempt at cover up at its face value, that still fails to obviate the undisputable legal mandate that any and all motions for leave to file time-sensitive [post-judgment] motions are **still required** by the law of civil procedure in a federal court of record to be DOCKETED, for *inter alia,* appellate review of the **record, and the record contains properly submitted evidence**.  Attempts to and actual *tampering* of filings consisting of documents, that aid the court by putting into context the materiality of the submitted evidence into the record, so as to remove records that aid in the appeal and *tampering* with official federal records, constitute attempts to and actual acts to *falsify* the record calculated to interfere with the appeal court's investigation of the facts and issues that concern criminal activities by the state government Defendants-Appellees in this matter.

**(2)** **Second Act of Alteration of the Record (Tampering) Through Abuse of Office By Covering up the Obstruction Tracks by Entering November 17, 2023 Text Orders Claiming the Court "Construes"  Plaintiff's Emails as motion for leave to file**

To cover up the scheme of obstructing docketing of the Appellant's post-judgment motions in violation of, *inter alia*, Fed. R. Civ. P 79,  Judge Smith's two TEXT ORDERS dated November 17, 2023 claim, with *deliberate* **ambiguity** that the court received emails from the Appellant and "construes" them as motions for leave to file.  Then the two TEXT ORDERS both denied them.  The TEXT

ORDERS deliberately remain silent on the content and substance of the emails. The TEXT ORDERS' deliberate omission of the **material** fact that Appellant filed in two separate emails her Rule 59 motion and Rule 60(b) Motion on **November 16, 2023** that suspends the finality of the final judgment is a deliberate tampering of the record. It is a deliberate interference and attempted deprivation of Appellant's right to appeal. It is a deliberate interference with and obstruction of an official federal proceeding.

**The unambiguous certainty on the record, nevertheless, is that Appellant's three motions filed on November 16, 2023 and on November 17, 2023 were all denied as of November 17, 2023.**

After the docket entry of the denials of all three of the Appellant's motions, Appellant filed the Notice of Appeal at 3:53 PM on November 17, 2023 (ECF 32, ECF 32-1). As afore-stated, Appellant's Notice of Appeal makes clear she requests appellate review of the actions of the district court obstructing docketing of Appellant's 2 timely Rule 59 motions filed on November 16, 2023 within 28 days of the final judgment, and Appellant's Rule 60(b)(1) motion filed on November 17, 2023 seeking relief from the district court's obstruction of docketing properly filed motions. Thus, Appellant's Notice of Appeal, ECF 32, ECF 32-1 preserves documentation of the criminal activity by the actors in the district court concerning record alterations and obstruction of a federal official proceeding.

A critical note on the federal law of civil procedure governing "motion for leave." The most common and frequent of those filed and docketed with the clerk in federal court are motions filed pursuant to Fed. R. Civ. P 15 governing motions for leave to amend pleadings/complaints. **Rule 15 Motions for leave to amend pleadings/complaints are required by law** *(e.g.*, **Fed. R. Civ. P 79) to be docketed**. Therefore, Judge Smith's docketing obstructions of "construed motions for leave to file motions" (emails are "written" motions) during the critical post-judgment period in which the right of appeal is further interfered with, similarly violate, *inter alia*, Fed. R. Civ. P 79.

**(3) <u>Third Act of Alteration of the Record (Tampering) Through Abuse of Office By Entering the November 20, 2023 TEXT ORDER falsifying the record that Appellant's timely November 16, 2023 Rule 59 Motions were filed out-of-time on November 17, 2023</u>**

Fed. R. Civ. P 79(a) states, "In General. The clerk <mark>must</mark> keep a record known as the "civil docket" in the form and manner prescribed by the Director of the Administrative Office of the United States Courts with the approval of the Judicial Conference of the United States. The clerk must enter each civil action in the docket. Actions must be assigned consecutive file numbers." The rule makes clear that each civil action in the docket must be entered on the date that each civil action occurred. Therefore, Rule 79(a) makes clear the clerk must enter Appellant's civil action of filing two Rule 59 motions on November 16, 2023 as civil actions that occurred on November 16, 2023. Any official's action taken to

alter the facts is fraud, and is an alteration of and tampering with the official government record.

### **Record Tampering by Judge Smith**

Judge Smith's November 20, 2023 Text Order clearly aims to accomplish two things:

(1) Tamper with the record of appeal in order to make Appellant's timely filed Rule 59 Motions falsely appear out-of-time by lumping 2 motions filed within-28 days-post-judgment **November 16, 2023** Rule 59 and Rule 60(b) motions filed on November 16, 2023 together with the November 17, 2023 Rule 60(b)(1) motion that petitioned for relief from Judge Smith's obstruction of docketing of Appellant's motions, falsely claiming all three were filed on November 17, 2023.  Judge Smith knows very well that is false and that his material falsification of the record will falsely make timely Rule 59 motions filed on November 16, 2023 to appear "out-of-time."

(2) After tampering with the record, Judge Smith, devoid of jurisdiction, knowingly and with intent calculated to conduct unlawful "re-do" litigation proceeding under false pretenses over Appellant's motions he

had ***already denied*** for the purpose of delaying and interfering with this instant appeal.

Upon the docketing of Appellant's Notice of Appeal, ECF 32, ECF 32-1, Judge Smith and the district court are **DIVESTED of JURISDICTION** over the district court's denials of the three post-judgment motions that are under appeal as merged with the final judgment.

(3) of the subsequent to the November 17, 2023 Notice of Appeal the same three Appellant post-judgment Rule 59 and Rule 60(b) motions regarding the final judgment that were all denied at 1:26 PM and 3:39 PM on November 17, 2023 prior to the Notice of Appeal – fundamentally, Judge Smith through the district court lacks jurisdiction on November 20, 2023 to "re-do" post-judgment motions regarding the final judgment that Judge Smith denied at 1:26 PM and 3:39 PM on November 17, 2023 prior to the Notice of Appeal at 3:53 PM.  This fundamental  court jurisdiction principle is a fundamental threshold matter this Court of Appeals must accurately and correctly act on.

**<u>Record Tampering by Clerks of the Court in the District Court</u>**

Fed. R. Civ. P 79 makes crystal clear that the law directs the clerk to keep accurate records and that <u>accurate</u> record keeping as well as the integrity of accurate records is <u>independent</u> of the judge.  If there is any doubt, the

**Government Edicts Doctrine** consisting of an entire extensive body of law spanning over 200 years makes clear the judge is powerless and lacks the authority to monopolize or control the publication of public government court records; the judge is powerless to order or instruct the clerk to copy right the part of the record considered to be judge-created law, for example.

Therefore, the clerks of the court knowingly **docketed Appellant's two November 16, 2023 Rule 59 and Rule 60 motions, including the "envelope" of the email filings DATED November 16, 2023** in the docket falsely entering all three entries for November 17, 2023, to make Appellant's timely two November 16, 2023 motions falsely appear "out-of-time." *See*, ECF 34, 35, 37 – but ECF 34-1 and ECF 35-1 **email** envelopes were dated **November 16, 2023** proving Appellant's two **November 16, 2023** Rule **59** and Rule **60(b)** motions were timely, *see, e.g.*, ECF 34-1, 35-1, that clearly show emails were sent on November 16, 2023.

Regardless of the label applied to the motion, a motion for reconsideration is deemed to arise under Rule 59 if filed within Rule 59's 28 days. *See*, e.g., *Mangieri v. Clifton*, 29 F.3d 1012, 1015 n.5 (5th Cir. 1994) ("A motion for reconsideration is deemed to arise under Rule 59 if filed within rule 59's . . . time limit regardless of the label applied to the motion." (internal quotations omitted)).

Both of Appellant's November 16, 2023 "Rule 59" motions were denied by the district court on November 17, 2023, in the ***first*** of the November 17, 2023 TEXT ORDER that makes clear that the district court ***reviewed*** and ***considered*** Appellant's November 16, 2023 two filings filed with the clerk via email and **DENIED** them.

The ***second*** of the two November 17, 2023 TEXT ORDER also makes clear that the district court ***reviewed*** and ***considered*** Appellant's November 17, 2023 Rule 60(b)(1) motion filed with the clerk via email, and **DENIED** it.

Thereafter, Appellant filed the November 17, 2023 Notice of Appeal, docketed ECF 32, 32-1. Thereafter, the district court clerk certified the record of appeal on November 17, 2023 (ECF 33, ECF 33-1).

Critically, as of the docketing of ECF 32 and docketing of ECF 33, the district court is **divested of jurisdiction** over Appellant's petitions electronically filed via email with the clerk dated November 16, 2023 and November 17, 2023 and the district court's respective **reviewed** and **considered DENIALS** that occurred on **November 17, 2023**, because those denials and the aforesaid actions taken in the district court by Judge Smith and the clerks of the district court in obeyance to Judge Smith that took place between November 16, 2023 and

November 17, 2023 **were included in the Appellant's Notice of Appeal dated**
**November 17, 2023** (ECF 32, 33).

Judge Smith, after scrutinizing Appellant's November 17, 2023 83-page
Notice of Appeal (ECF 32, 32-1) that underlined documented his obstruction of docketing of
Appellant's filings in violation of, *inter alia*, Fed. R. Civ. P 79, sought to cover his
tracks and his issuance of the November 20, 2023 TEXT ORDER, *inter alia*, sua
sponte ***reconsidering*** Appellant's November 16, 2023 and November 17, 2023
motions are null and void <mark>**DEVOID OF/LACKS JURISDICTION**</mark>.  His void
November 20, 2023 deliberate instructions to the district court clerk to falsely
docket Appellant's timely Rule 59 motions as November 17, 2023 filings in order
to falsely make them appear out of time was calculated to and has tampered with
the record, but are null and void.  His instructions to ***litigate Appellant's Rule 59***
***and Rule 60 Motions that he had already denied, which denials were already***
***under appeal as of November 17, 2023, are null and void devoid of jurisdiction***.

Therefore, the district court's TEXT ORDER dated November 20, 2023 is a
nullity and is void.

**Appellant's November 20, 2023 Notice of Appeal is a timely (filed within**
**30 days of the final judgment) second appeal of the final judgment and a**
**second appeal of the district court's obstruction of docketing paper filings**
**between November 16, 2023 and November 17, 2023 to include appellate**
**review of Judge Smith's null and void November 20, 2023 Order, which this**
**motion  instructing the district clerk to falsely docket**

On March 1, 2024 this First Circuit Court of Appeals GRANTED

Appellant's Motion for Extension of Time to Show Cause in support of

Appellant's motion to consolidate Appeal No. 23-1967 and No. 23-1978, to April

1, 2024.  Appellant intends to, is preparing and shall comply with the Court's

March 1, 2024 Court Order, and will file Appellant's Show Cause accordingly.

Appellant's Monday, November 20, 2023 Notice of Appeal (ECF 38) was

timely, since 30 days post-judgment fell on Saturday, November 18, 2023.

In aid of the Court, Appellant hereby restates what was stated in the

November 20, 2023 Notice of Appeal [ECF 38]:

"MARY SEGUIN appeals to the United States Court of Appeals for the FIRST Circuit from the
Text Order entered November 20, 2023, that is merged with the final judgment entered on October
19, 2023.

The filing of this herein Notice of Appeal on November 20, 2023 is within the 30-day period post-
judgment, pursuant to **Federal Rules of Appellate Procedure 4**.  **Pursuant to Federal R. of
Appellate P. 3(c) and 4**, Plaintiff's timely post-judgment Rule 59 and Rule 60 Motions filed on
November 16, 2023 were filed within 28 days of the October 19th judgment.  The November 20,
2023 Order is an extraordinary order that attempts to back-peddle on the evidentiary contents of
the entire Notice of Appeal document filed on November 17, 2023 (ECF 32, 32-1, 33, 33-1).

Plaintiff's discovery of the concealed, behind-the-scenes interference by Judge Smith "in
Chambers" obstructing the Clerks of the Court from docketing Plaintiff's timely-filed and by right
Rule 59 and Rule 60 Motions on November 16, 2023 (within 28 days post-judgment), and then
Plaintiff's timely filed pre-Notice of Appeal Rule 60(b)(1) Motion on November 17, 2023 are
documented issues on appeal in the docketed Notice of Appeal (ECF 32) and envelope containing
the associated emails (ECF 32-1).  *See also* attached email regarding the filing by email to the
Clerk of Court Notice of Appeal. As documented in the record, Judge Smith's disqualification is
an integral issue on appeal, *see* (ECF 32, 32-1), that shows extra-judicial obstruction of docketing
the Plaintiff's timely filed post-judgment motions.  As such, the November 20, 2023 Text Order
is merged with the final judgment entered on October 19, 2023.

No litigant, *pro se* or not, shall ever face the interference or the obstruction of the docketing of properly filed Court-rule-compliant or Court-compliant motions or a Fed. R. of Appellate P. 3 Notice of Appeal by right by any district court judge, be it in an extra-judicial manner or behind the scenes or on the record, in any federal court of record at any stage of litigation within the First Circuit, especially when those motions petition his disqualification under 28 U.S.C. § 455."

**B. Judge Smith's Abuse of Office Violation of Fed. R. Civ. P 79 in the District Court for the District of Rhode Island Involving the Illegal Alteration of the Record in a Federal Court of Record in an Official Federal Proceeding Intends to Thwart Appellate Review of, and is Influenced and Motivated by and In Response to, Appellant's Electronic Filing of the Amended Complaint [ECF 25] Dated September 1, 2023 in Which Evidence Is Preserved of the Appellant Reporting to the Federal Judiciary In the District of Rhode Island Extensive Criminal Activity by the Defendants-Appellees Who, *Inter Alia*, Violate 18. U.S.C. 666**

**(1) Appellant's Good Faith Reliance on 18. U.S.C.§ 4 Misprision of Felony**

Appellant, proceeding *pro se* from Texas, drafted and filed on **September 1, 2023 Plaintiff's Amended Complaint [ECF 25]** in good faith, and relied in good faith on the relevant part of **18 U.S.C. §4** Misprision of felony, that states, "Whoever, having knowledge of the actual commission of a felony cognizable by a court of the United States, conceals and does not as soon as possible make known the same to ***some judge*** or other person in civil or military authority **under the United States**…"  and in good faith relied on, the relevant parts of **18 U.S.C. §666** and in good faith relied on the **"BRIEF FOR THE UNITED STATES AS AMICUS CURIAE SUPPORTING REVERSAL" submitted**

**by the United States Department of Justice and the United States Department of Health and Human Services** in the seminal U.S. Supreme Court case *Turner v. Rogers*, 564 U.S. 431 (2011), ( Appellant attaches herein a copy of said Amicus Brief as **Exhibit A),** and outlined in good faith in Plaintiff's Amended Complaint (ECF 25) the commission of several crimes, that in effect, pursuant 18 U.S.C. **§** 4, "as soon as possible make known to "some judge" under the United States," namely, Judge William Smith.

Appellant respectfully requests Judicial Notice in aid of the appeal of the extensive citation by U.S. Department of Justice and U.S. Department of Health and Human Service's Administration, therefore the United States's administration of the Title IV-D Program of the Social Security Act, of Social Services Amendments, (*See* **Exhibit A**) of 1974, Pub. L. No. 93-647, § 101(a), 88 Stat. 2351 (42 U.S.C. 651 et seq.) § 101(c)(5)(C), 88 Stat. 2360; 42 U.S.C. 654(4), 42 U.S.C. 654(6) (1976), 42 U.S.C. 654(8), 42 U.S.C. 654(16), 42 U.S.C. 654(24), 42 U.S.C. 654a(a), 42 U.S.C. 654a(e)(1), 42 U.S.C. 654a(e)(4), 42 U.S.C. 654a(e)(5), 42 U.S.C. 654a(g)(1), 42 U.S.C. 655(a)(2), 42 U.S.C. 655(a)(2)(C), 42 U.S.C. 655(a)(3)(A), 42 U.S.C. 655(a)(4), 42 U.S.C. 656(a)(1) (1976), 42 U.S.C. 657(a)(4)(B) (1976), 42 U.S.C. 657(b) (1976), 42 U.S.C. 666(a)(1)-(8), 42 U.S.C. 666(a)(3)(A), 42 U.S.C. 666(a)(7)(B)(i), 42 U.S.C. 666(a)(8)(A)(iv), 42 U.S.C. 666(b), 42 U.S.C. 666(c), 42 U.S.C. 666(c)(1)(H),

Child Support Enforcement Amendments of 1984, Pub. L. No. 98-378, 98 Stat.

1329: § 6, 98 Stat. 1314, § 23(a)(2), 98 Stat. 1329, § 23(a)(5), 98 Stat. 1329,

Family Support Act of 1988, Pub. L. No. 100-485, 102 Stat. 2343 § 123(a)(C),

102 Stat. 2352, Personal Responsibility and Work Opportunity Reconciliation

Act of 1996, Pub. L. No. 104-193, 110 Stat. 2105, § 344(a)(2), 110 Stat. 2235

Social Security Act Amendments of 1950, ch. 809, § 321(b), 64 Stat. 550,

Social Security Amendments of 1967, Pub. L. No. 90-248, § 201(a)(1), 81 Stat.

877-879, § 201(a)(1), 81 Stat. 879 8 U.S.C. 1229a(b)(4)(A), 8 U.S.C. 1362, 18

U.S.C. 3006A(b), 28 U.S.C. 1257(a), 42 U.S.C. 602(a)(26) (1976), 42 U.S.C.

608(a)(3)(A), 42 U.S.C. 608(a)(7), 45 C.F.R.: Section 302.70(a)(5)(iii) Section

303.5(g)(2)(iii),  Section 303.6 (1975),  Section 303.6 (1989), Section

303.20(c)(7) (1975), Section 303.20(c)(7) (1989), Section 303.100(a)(6),

Section 303.100(f)(4), Section 303.101(c)(2), Section 303.102(c)(1), Section

303.104(b), Section 304.20(b)(3)(iv), Section 304.23(i), Section 304.23.

The United States' Amicus Brief further relied on the following authorities:

52 Fed. Reg. 32,130 (1987), U.S. Dep't of Health & Human Servs.: *National*

*Child Support Enforcement, Strategic Plan: FY 2005-2009*,

http://www.acf.hhs.gov/programs/cse/pubs/2004/Strategic_Plan_FY2005-

2009.pdf; *Office of Child Support Enforcement, National Status of Automated*

*Child Support Systems*,

http://www.acf.hhs.gov/programs/cse/stsys/certmap.htm, Elizabeth G.

Patterson, *Civil Contempt & the Indigent Child Support Obligor: The Silent*

*Return of Debtor's Prison*, 18 Cornell J.L. & Pub. Pol'y 95 (2008), S. Rep. No.

387, 98th Cong., 2d Sess. (1984); Elaine Sorensen et al., *Assessing Child*

*SupportArrears in Nine Large States & the Nation (2007)*

http://aspe.hhs.gov/hsp/07/assessing-CS-debt/report.pdf.

Therefore, Appellant relied on the authority of the United States *and* the

United States Supreme Court's 2011 review of the above Amicus Brief

submission by the United States, and the *Turner* Court's adoption of urgings in

the United States' Amicus Brief, to draft Plaintiff's Amended Complaint (ECF

25).  In relying on the legal authorities cited by the United States Department of

Justice and the United States Department of Health and Human Services,

Appellant became aware of **Rhode Island's ineligibility for, *inter-alia*,  Title**

**IV-D federal funding** (and yet the Defendants-Appellees' are and have been

procuring and receiving millions of dollars in *excess* of $5,000 and in *excess* of

$10,000), as well as became aware of the funding eligibility criteria that were

repeatedly emphasized by the United States Department of Justice and the

United States Department of Health and Human Services in the Amicus Brief.,

*e.g.*, ""Procedural due process imposes constraints on governmental decisions

which deprive individuals of 'liberty' or 'property' interests within the meaning

of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). *See also* page 21 "the government's interests also favor additional procedural safeguards." *Id*. *See also*, page 30, "**Congress and the Secretary have demonstrated their concern that child-support-related proceedings be conducted fairly by repeatedly making compliance with procedural due process rules a requirement of State participation in the program.**" *See, e.g.*, 42 U.S.C. 666(a)(3)(A) (reduction of non-custodial parents' state income tax refunds to pay overdue support permitted only "after full compliance with all procedural due process requirements of the State"); 42 U.S.C. 666(a)(7)(B)(i) (States must report child-support delinquency to credit bureaus "only after [the] parent has been afforded all due process required under State law, including notice and a reasonable opportunity to contest the accuracy of such information."); 42 U.S.C. 666(a)(8)(B)(iv) (income withholding "must be carried out in full compliance with all procedural due process requirements of the State"); 42 U.S.C. 666(c)(1)(H) (expedited State agency procedures "shall be subject to due process safeguards, including (as appropriate) requirements for notice, opportunity to contest the action, and opportunity for an appeal on the record to an independent administrative or judicial tribunal"); see also 45 C.F.R.

302.70(a)(5)(iii), 303.5(g)(2)(iii), 303.100(a)(6) & (f)(4), 303.101(c)(2), 303.102(c)(1), 303.104(b)." *Id*.

In 2023, when drafting the Amended Complaint, Appellant relied on the U.S. Supreme Court caselaw *Johnson v. City of Shelby*, 135 S. Ct. 346 (2014) in which the Court made clear that the complaint passed muster as long as it "stated simply, concisely, and directly events that, they alleged, entitled them to damages." *Id*. at 347, see also *id*. ("Having informed the city of the factual basis for their complaint, they were required to do no more to stave off threshold dismissal for want of an adequate statement of their claim.")

### **ECF 25 Plaintiff's Amended Complaint Shows Rhode Island Violates the Requirements to Participate in the Program**

Defendants-Appellees never responded to the September 1, 2023 Plaintiff's Amended Complaint (ECF 25). Discovery was never conducted. This case never went to trial.

At the pleading stage of litigation in district court, the Court must accept as true all factual allegations in the complaint.

A critical factual allegation underpinning the actions committed by the Defendants-Appellees are the statutory texts of **42 U.S.C. § 654 (21)(A)** –42 U.S. Code § 654 - State plan for child and spousal support

A State plan for child and spousal support must—

**(1)** provide that it shall be in effect in all political subdivisions of the State;

**(2)** provide for financial participation by the State;

**(3)** provide for the establishment or designation of a single and separate organizational unit, which meets such staffing and organizational requirements as the Secretary may by regulation prescribe, within the State to administer the plan;

**(21) (A)** at the option of the State, impose a late payment fee on all overdue support (as defined in section 666(e) of this title) under any obligation being enforced under this part, in an amount equal to a uniform percentage determined by the State (==not less than 3 percent nor more than 6 percent==) of the overdue support, which shall be payable by the noncustodial parent owing the overdue support;

— And ==42 U.S. Code § 654a== - Automated data processing –

**(a)In general**

In order for a State to meet the requirements of this section, the State agency administering the State program under this part shall have in operation a single statewide automated data processing and information retrieval system which has the capability to perform the tasks specified in this section with the frequency and in the manner required by or under this part.

**(b)Program management** The automated system required by this section shall perform such functions as the Secretary may specify relating to management of the State program under this part, including—

**(1)** controlling and accounting for use of Federal, State, and local funds in carrying out the program; and

**(2)** maintaining the data necessary to meet Federal reporting requirements under this part on a timely basis.

**(c)Calculation of performance indicators** In order to enable the Secretary to determine the incentive payments and penalty adjustments required by sections 652(g) and 658a of this title, the State agency shall—

**(1)** use the automated system—

**(A)** to maintain the requisite data on State performance with respect to paternity establishment and child support enforcement in the State; and

**(B)** to calculate the paternity establishment percentage for the State for each fiscal year; and

**(2)** have in place systems controls to ensure the completeness and reliability of, and ready access to, the data described in paragraph (1)(A), and the accuracy of the calculations described in paragraph (1)(B).

**(d)Information integrity and security** The State agency shall have in effect safeguards on the integrity, accuracy, and completeness of, access to, and use of data in the automated system required by this section, which shall include the following (in addition to such other safeguards as the Secretary may specify in regulations):

**(1)Policies restricting access** Written policies concerning access to data by State agency personnel, and sharing of data with other persons, which—

**(A)** permit access to and use of data only to the extent necessary to carry out the State program under this part; and

**(B)** specify the data which may be used for particular program purposes, and the personnel permitted access to such data.

**(2)Systems controls** Systems controls (such as passwords or blocking of fields) to ensure strict adherence to the policies described in paragraph (1).

**(3)Monitoring of access** Routine monitoring of access to and use of the automated system, through methods such as audit trails and feedback mechanisms, to guard against and promptly identify unauthorized access or use.

**(4)Training and information** Procedures to ensure that all personnel (including State and local agency staff and contractors) who may have access to or be required to use confidential program data are informed of applicable requirements and penalties (including those in section 6103 of the Internal Revenue Code of 1986), and are adequately trained in security procedures.

**(5)Penalties** Administrative penalties (up to and including dismissal from employment) for unauthorized access to, or disclosure or use of, confidential data.

**(e)State case registry**

**(1)Contents**The automated system required by this section shall include a registry (which shall be known as the "State case registry") that contains records with respect to—

**(A)** each case in which services are being provided by the State agency under the State plan approved under this part; and

**(B)** each support order established or modified in the State on or after October 1, 1998.

**(2)Linking of local registries** The State case registry may be established by linking local case registries of support orders through an automated information network, subject to this section.

**(3)Use of standardized data elements** Such records shall use standardized data elements for both parents (such as names, social security numbers and other uniform identification numbers, dates of birth, and case identification numbers), and contain such other information (such as on case status) as the Secretary may require.

**(4)Payment records** Each case record in the State case registry with respect to which services are being provided under the State plan approved under this part and with respect to which a support order has been established shall include a record of—

**(A)** the amount of monthly (or other periodic) support owed under the order, and other amounts (including arrearages, interest or late payment penalties, and fees) due or overdue under the order;

**(B)** any amount described in subparagraph (A) that has been collected;

**(C)** the distribution of such collected amounts;

**(D)** the birth date and, beginning not later than October 1, 1999, the social security number, of any child for whom the order requires the provision of support; and

**(E)** the amount of any lien imposed with respect to the order pursuant to section 666(a)(4) of this title.

**(5) Updating and monitoring** The State agency operating the automated system required by this section shall promptly establish and update, maintain, and regularly monitor, case records in the State case registry with respect to which services are being provided under the State plan approved under this part, on the basis of—

**(A)** information on administrative actions and administrative and judicial proceedings and orders relating to paternity and support;

**(B)** information obtained from comparison with Federal, State, or local sources of information;

**(C)** information on support collections and distributions; and

**(D)** any other relevant information.

Moreover, 42 USC 654(A)(21) is a section of the United States Code that **provides that support payments collected for an individual with respect to whom an assignment pursuant to section 608 (a) (3) of this title is effective, shall be made to the State for distribution pursuant to section 657 of this title and shall not be paid directly to the family**[1]. In order for a State to meet the requirements of this section, the State agency administering the State program under this part shall have in operation a single statewide automated data processing and information retrieval system which has the capability to perform the tasks specified in this section with the frequency and in the manner required by or under this part[2].

In violation of 42 U.S.C. 654(21)(A), Rhode Island routinely charges 12% compound interest on overdue support within the Title IV-D legal framework.

In violation of 42 U.S.C. 654a, (which automated system is federally funded at 90%), Rhode Island routinely *removes from* the mandatory automated system its violative 12% compound interest when it sends to other states, *e.g*., Texas, in order to avoid detection of the illegal 12% compound interest by federal and other states' (*e.g*., Texas) law enforcement, and upon information, when controlling and

accounting for use of Federal funds in carrying out the program; and **(2)**
maintaining the data necessary to meet Federal reporting requirements under this
part on a timely basis; and **(c) Calculation of performance indicators** In order to
enable the Secretary to determine the incentive payments and penalty adjustments
required by sections 652(g) and 658a of this title, the State agency shall—**(1)** use
the automated system—**(A)** to maintain the requisite data on State performance
with respect to paternity establishment and child support enforcement in the State.

Appellant respectfully requests Judicial Notice that Title IV-D of the Social
Security Act was enacted by Congress with the intent to combat poverty among
single mother-households. Appellant respectfully requests judicial notice of Title
IV-D Program's structure that provides in welfare cases, the welfare recipient
assigns the ordered support to the State's Title IV-D Support Enforcement Agency,
so that the entire support order is thus turned into a "debt owed to the State," and
the interest on overdue support represents a form of "incentive" fee to the State
incentivizing collection enforcement, which at 12% compound interest, represents
a *lucrative* revenue to the State "extorted under color of state law" from
unsuspecting noncustodial parents using the Title IV-D Program legal framework
(that was intended to combat poverty) to enrich the State's coffers.

Put simply, Rhode Island routinely removes the 12% compound interest
from the automated accounting system in order to cover it up from enforcement

detection, especially from detection by enforcement outside of the state, thereby routinely engages in in-state and interstate accounting fraud, falsifying accounts, and theft of the Title IV-D Program and of unsuspecting individual noncustodial parents, among others.

Therefore, Rhode Island had denied and continue to deny access to the accounting portion of Appellant's Support case file underpinning the 42 U.S.C. 654a mandated showing of "$0.00" interest on Appellant's ONLINE Support Account that Appellant took a screenshot of on December 6, 2021, at which time Rhode Island removed the interest from the 42 U.S.C. 654a-mandated automated system when Rhode Island claimed it sent enforcement interstate to Texas.

Instead in 2023, Rhode Island produced a set of accounting that completely do not reconcile with the accounting they showed to the Appellant on Appellant's online Support account on December 6, 2021.

Defendant-Appellee Paul Gould and the Office of Child Support Services state that he is "not going to be made into a tool to give Mary Seguin information for her federal lawsuits" where 42 U.S.C. 654 and 666 make clear that under the State Plan, lawful accurate accounting access to all interested and entitled parties, (with the highest priority pursuant to the multiple "DUE PROCESS' requirement for State participation throughout Title IV-D, to the noncustodial parent), is a

requirement for State participation in Title IV-D Program. The Amended

Complaint clearly factually alleges multiple times that the Defendant-Appellee's

multiple removals of interest and then putting interest back on the automated

system has resulted in at least SEVEN different sets of books of accounts resulting

from falsified accounting produced by Defendants-Appellees sent to Texas, each

one of the seven disparate alleged "arrears" was unsubstantiated by a complete

statement of accounts, but each alleged arrears continued to balloon by upwards of

at least 30% increase each time.

## Rhode Island's Fraud and Theft Scheme

How the aforesaid Rhode Island scheme targeted the Texas Appellant is outline

in the Amended Complaint. The Amended Complaint (ECF 25) factually alleges,

in summary, that after refusing to speak with Appellant's Texas attorney who

contacted the Defendant-Appellees querying what arrears was owed, Defendant-

Appellee Rhode Island Office of Child Support Services, on December 6, 2021,

after showing the Texas Appellant in Texas Appellant's online Support account

maintained by the Rhode Island State Appellees, told Appellant that the "$0.00"

shown on the online account was because Defendant-Appellee waived interest.

The Complaint factually alleges that because no notice was given to nor received

by the Appellant of back due support, Appellant was unaware that support was

owing. With no way of knowing what support was owing, Appellant retained

counsel in Texas to contact Appellee RI Office of Child Support Services ("RI OCSS").

Upon contact by Appellant's Texas counsel on or about October 2021, RI OCSS declined dealing with Appellant's Texas counsel, insisting that RI OCSS would only speak directly to Appellant personally, in a scheme to 1) deprive Appellant of counsel representation calculated to disadvantage the unsuspecting Appellant; 2) continue hiding from any Texas counsel, whom Appellees feared would then identify Rhode Island's illegally procured 12% compounded interest on back support under 42 U.S.C. 654 that disallows 12% compound interest on overdue support, that is further unenforceable in Texas, and that RI OCSS had arbitrarily removed from the system in 2018 in an attempt to hide the 12% compound interest from enforcement authorities in Texas (and federal authorities) when they sought to send to Texas for support collection.

When Appellant was thus fraudulently deprived by inducement from counsel representation and forced to directly contact pro se by phone RI OCSS on December 6, 2021, Defendant-Appellee Karla Caballeros lied to the Appellant that it is the agency's policy to deal directly with the noncustodial and custodial parents, and not with counsels.  This is not true, as in reality, unbeknownst to the Appellant, Defendant-Appellee Kevin Tighe of RI OCSS on the same day picked up the phone and directly called Barbara Grady, Defendant-Appellee Gero

Meyersiek's private family law lawyer (Barbara Grady's former husband was an

Appellee-RI OCSS senior counsel and friend of Defendant-Appellees Kevin Tigue,

Frank DiBiaise, Prisicilla Glucksman, John Langlois and Paul Gould, and upon

information and belief Barbara Grady has/had a fee-sharing and monetary deal

sourced from targeting unsuspecting noncustodial parents with, *inter-alia*,

Appellees Tigue, Dibiaise, Glucksman, Langlois and Gould), to discuss the fact

that the 12% compounded interest is unenforceable in Texas and therefore

removed from the system by the RI OCSS in 2018, and proposed that Meyersiek

waive interest if Plaintiff paid $104K in one lump sum as principle.  Kevin Tighe

explicitly discussed this contract term with Barbara Grady in terms of "keeping off

the system the interest that was already removed by RI OCSS in 2018."  Barbara

Grady called back and said yes, Appellee Meyersiek agreed to waive interest if

Appellant paid $104k.  Appellee Karla Caballeros then represented to the

Appellant that if Appellant agreed to payoff the principle, Appellee Gero

Meyersiek agreed to waive interest.  $104k is $11,000 more than the $93,214.56

principle shown in Appellee RI OCSS's 42 U.S.C. 654a automated record system

maintained under 42 U.S.C. 654a's mandate that feeds Appellant's OCSS online

child support account, which Appellee Karla Caballeros further showed Appellant

on December 6, 2021, stating the $0 shown under interest is because Gero

Meyersiek waived interest.   Appellant in Texas took a screenshot of this on

December 6, 2021 of Appellant's online OCSS accounting, fed by the automated

support record keeping system mandated to be accurate by 42 U.S.C. 654a,

showing as of November 30, 2021 support due in the amount of $93,214.56.

Appellant in Texas accepted, and told Appellee Karla Caballeros Appellant

accepted and agreed to pay the lump sum payoff amount shown on the screen in

consideration of Appellee Meyersiek had waived interest, not knowing RI OCSS

had removed from the system in 2018 the 12% compounded interest that was

unenforceable.  RI OCSS breached its duty to disclose that material fact to the

Texas Appellant intentionally.  RI OCSS intentionally failed to disclose to

Appellant that they had removed the interest from the system illegally in violation

of 42 U.S.C. 654a.  The cover up was intentional.  At the time, Appellant asked for

an accounting statement of the account but was never given the full interest amount

that was waived nor the rate of interest by Appellee Karla Caballeros when

Appellant repeatedly asked for an accounting and statement of account.  Appellee

Karla Caballeros lied that she did not know and needed to ask "the Accounting

department," then never responded thereafter.  The cover up was intentional.

When Appellant agreed to the deal brokered by Appellee RI OCSS, Appellee

Kevin Tighe told Appellee Wendy Fobert to manually adjust the account records to

show $104,185.98 and instructed Appellee Karla Caballeros to email Plaintiff on

December 7, 2021 that "Accounting says to wire $104,185.98." Appellee Karla

Caballeros further stated to Appellant that Accounting advised the extra $11,000 is

for medical support that was not included in the $93,214.56 shown on Appellant's

online account maintained by RI OCSS.   Since under RI OCSS's Debt

Compromise Policy reported to the U.S. Department of Health and Human

Services, RI OCSS, in agreement with the contract terms of interest waiver and

interest debt forgiveness by the State that it reports to the U.S. Department of

Health and Human Services that administers Title IV-D Programs under 42 U.S.C.

654 and 42 U.S.C. 666, routinely brokers agreements between in-state and

interstate custodial and noncustodial parties and forgives interest, Appellant in

good faith justifiably relied on the written advisement, upon receipt of the emailed

written advisement from Appellee Caballeros on the morning of December 7,

2021, to Seguin in Texas that said, "….accounting says to pay $104,185.98 by

bank wire transfer to RI OCSS's child support collection bank account" with bank

wire instructions to RI OCSS's bank account.  On December 7, 2021, Appellant in

Texas, in good faith, accepted Karla Caballeros' offer, as broker agent of

Defendant-Appellee Gero Meyersiek, to **pay off child support in full** in the

amount of $104,185.98 in one lump sum, in consideration of Defendant-Appellee

Gero Meyersiek had waived interest.  Also, on December 7, 2021, Appellant

performed on the contract in Texas and wired on the same day the agreed amount

of $104,185.98 through bank transfer of Texas bank account property in Texas to

RI OCSS's child support collection bank account in Connecticut, as instructed on

December 7, 2021 by Appellee RI OCSS and Appellee Karla Caballeros via email.

Appellant thus in Texas accepted and performed on the contract with Defendant-

Appellee Gero Meyersiek, brokered by Defendant-Appellee RI OCSS acting as

agent of Defendant-Appellee Gero Meyersiek.

After Appellant accepted and performed on the contract in Texas on

December 7, 2023 the aforesaid agreement, Appellee RI OCSS and Appellee John

Langlois disclosed,  "what happened in this case is when Mary's representative,

her attorney, called us in late November 2021 and said she wants her passport

released, what does she have to do to release her passport, they put her in touch

with Karla, who gave her the $104k number.  Where that number came from was

the department attorney contacted the custodial parent, Mr. MEYERSIEK.  So, we

contacted his attorney, it wasn't me, it was somebody else in my office, and said, if

she was willing to make a $104k payment to pay off the principle, would you be

willing to waive the $75k or $73k in arrears.  At that time, he said yes.  So Karla

notified Mary that if she paid the $104k, it would be paid in full because he was

willing to waive the interest, that was just the principle.  What happened was the

day after Karla told Mary to wire the $104k the attorney for Mr. Meyersiek

contacted us again and said he changed his mind.  Please put the interest back on

the system.  So we did."

RI OCSS, through civil and criminal fraud and civil breach of contract, in violation of 42 U.S.C. 654a, put back on the automated system allegedly the "$75k or $73k" interest, which RI OCSS to date continues to deny Appellant access to the exact accounting documentation of the exact amount of interest was put back on the system, never told the Appellant interest was put back on the system, and proceeded to falsely lien Appellant's Texas properties through manual issuances that look like a "letter Notice of Lien typed on RI OCSS letter head" for the unsubstantiated $75,638.00 on Appellant's Texas bank accounts (Texas property) and Texas Insurance assets (Texas property), in violation of federal criminal codes and in violation of Texas Penal Codes.

Appellant appealed the unsubstantiated liens on her Texas property to the Rhode Island Executive Office of Health and Human Services Appeals Office ("RI EOHHS"), a Title IV-D administrative adjudication agency under the State Plan 42 U.S.C. 654, in April 2022. From April 2022 to October 2022, RI OCSS engaged in a campaign of cover-up and refused to provide Appellant access to her support file in a Title IV-D appeal proceeding, due to the incriminating evidence of the criminal and civil fraud accounting, violations of 18 U.S.C. 666, among other civil and criminal violations. In October 2022, after being told by the Appeals Officer of RI EOHHS that RI OCSS bears the burden of proof of showing any alleged arrears is owed (which threatens disclosure of the covered up scheme of

manipulating accounting through removing and putting back on the system 12% compound interest disallowed under 42 U.S.C. 654(21)(A), Appellee withdrew the interstate fraudulent lien instruments (which were fraudulent and RI OCSS's repeatedly stated refusals (evidence of which Appellant recorded in Texas in a phone conversation in which RI OCSS and Appellant were participants per the factual allegations in the Amended Complaint, ECF 25) to release such fraudulent liens of $75,638.00 on Appellant's Texas property additionally violate Texas Penal Codes) for the purpose of causing the RI OCSS unfavorable RI EOHHS Title IV-D administrative agency appeal office to lose jurisdiction.  RI OCSS reasoned that the Appellee Rhode Island Judiciary would aid and abet their unlaw scheme and would aid in continual cover up of the scheme, because historically and routinely, by unofficial policy, the RI Judiciary had and does.

The Rhode Island Family Court is the equivalent of the South Carolina Family Court in 2011 in *Turner v. Rogers*.  In practice and in policy, Appellee RI OCSS have a symbiotic mutually beneficial understanding with the RI Family Court establishing 12% compound interest, enforce 12% compound interest, and is the symbiotic vehicle with the powerful force of law rubber-stamping and enabling the 12% compound interest establishment and collection that created lucrative revenue to the State actors through the deliberate installation of due process violative digital courts that specifically violates requisite due process mandated by

Title IV-D in order to enable manipulating the outcome to a foregone conclusion whenever RI OCSS seeks to abuse the power of the state judiciary to collect the illegal 12% compound interest that is disallowed under the State Plan clearly forbidden in the statutory text of 42 U.S.C. 654(21)(A).

**_Firstly_** the RI Judiciary lied to the public while spending $6 million installing the state-wide digital court in 2014 that the electronic court system will allow ALL COURT USERS to call up court documents from their mobile devices, including claiming "if you know how to order merchandise from Amazon, you can easily use this new system."  However, quietly behind the scenes, the RI Judiciary abusing its power to promulgate court rules (law of civil and criminal procedure), promulgated Rule 5 in 2014 and _denied_ access to electronic court information, including judge-created laws, over the internet, targeting only 1) the Public; 2) pro-se litigants; 3) parties to the litigation, in violation of the Government Edicts Doctrine, in violation of the Constitution's First Amendment, Fourth Amendment, Fifth Amendment, Sixth Amendment, Fourteenth Amendment, Due Process and Equal Protection Clause, Privileges and Immunities Clause and the Supremacy Clause, in violation of 18 U.S.C. 242, Wire Fraud, RICO, 42 U.S.C. 654, 42 U.S.C. 666, among others.  Only Rhode Island attorneys are allowed access, and select state government actors.  Therefore, access of "judge-created" laws created in the digital courts of 12% compound interest is denied and covered up.  There

isn't even a "pay-per-view" of the judge-created laws in Rhode Island, as in the federal PACER. Access was, is and continues to be denied. In aid of this appeal, since September 2023 Appellant had repeatedly requested and continues to request the Rhode Island Supreme Court to repeal its access denial to the Public that is in violation of the Government Edicts Doctrine and the First Amendment access of public court records, but to no avail.

**Secondly**, per factually alleged in the Amended Complaint (ECF 25), Appellant has first-hand knowledge and is a June 8, 2023 witness to the RI OCSS-acknowledged scheme that in 2014 the RI Judiciary implemented the Rhode Island state-wide digital courts **deliberately failing** to fully integrate Appellee RI Department of Human Services's and Appellee RI OCSS's legacy electronic case management system so as to cause the Rhode Island Appellees's Title IV-D agencies court filings to be **only noticed and visible** to the judges of Title IV-D proceedings and themselves. In other words, the unsuspecting pro-se litigants discussed in the United States Department of Justice Amicus Brief in *Turner v. Rogers*, by definition, the pro se Appellant, is neither noticed nor has access in the Title IV-D digital courts to Appellees RI Department of Human Services and RI OCSS's filings, **in abject violation of the due process requirements for State participation in Title IV-D**. This material Rhode Island ineligibility to participate in Title IV-D is actively covered up by all Appellees as well as counsels of record

for all Appellees, **in violation of 18 U.S.C. 3 and 4**.  And when Appellant's

September 1, 2023 Amended Complaint (ECF 25) served as 18 U.S.C. 4's "make

known to some judge" of the United States, namely, district court Judge William

Smith, *his* response was to dismiss the Amended Complaint, obstruct the docketing

of Appellant's timely **November 16, 2023 Rule 59 Motions** that document, *inter*

*alia*, moving to disqualify Judge Smith, so as to aid and abet the furtherance of

cover up of violations of 18 USC 666 by Rhode Island Appellees.

As the matter of jurisdiction is the threshold for the alleged lack of subject

matter jurisdiction Judge Smith claims for the Article III courts to hear 42 U.S.C.

1983 monetary damages claims, Judge Smith relies on the *limited* jurisdiction state

family court as a jurisdictionally competent venue to hear Appellant's federal

claims for monetary damages, knowing fully well that the U.S. Supreme Court had

already thrice reviewed the jurisdiction competences of Rhode Island's state courts

to hear federal monetary claims brought under 42 U.S.C. 1983 under the

Supremacy Clause, and most recently ruled in *Haywood v. Drown*, **556 U.S. 729**

**(2009)** that **only** the general jurisdiction Rhode Island Superior Court (for damages

claims in excess of $10,000) has jurisdiction to hear 42 U.S.C. 1983 causes of

action, applying the Supremacy Clause.

**Judge Smith has intimate knowledge of the RI Judiciary's Incentive
schemes and the RI Family Court's Incentive Schemes, as the State Court's
Legal Counsel and his obstruction of the docketing of Appellant's post-**

**judgment motions and his subsequent November 20, 2023 alteration of the
record are calculated to and has the intended effect of covering up the 18 USC
4 reported activities that include 18 USC 666 violations alleged in the
Amended Complaint, ECF 25**

The Rhode Island Judiciary's Incentive scheme and the Rhode Island
Courts' Incentive Schemes include financial incentives for increasing the dollar
amount of collection of support through the Rhode Island family court, with the
illegal 12% compound interest on back due support scheme utilizing Title IV-D
Program's legal framework, 100% of which goes towards the State as "state debt,"
enriching the State's coffers, representing the most lucrative component of the
"support collection" through the state's family court.  This is a "volume-driven"
racketeering *business* that predominantly target unsuspecting *pro se* noncustodial
parents, like that described by the United States Department of Justice and the
United States Department of Health and Human Services in its Amicus Brief in
*Turner v. Rodgers*.  *See* **Exhibit A**, *Id*.  In the process, debtor prisons are
fraudulently created through a federal program legal framework originally intended
by Congress to combat poverty, through which the unlawful "processing of" these
"enforcements" representing more sources of federal enforcement funding for a
violative state organization, agency and actors, like the Rhode Island Appellees.
The United States is thus defrauded of millions of dollars in the state's fraudulent
vicious cycles of malicious prosecution, abuses of process and ultimately

incarceration of innocent victims, in violation of the original intent of Congress enacting Title IV-D of the Social Security Act to combat poverty.

In good faith, Appellant reported this to Congress, relying on the United States Amicus Brief submitted in *Turner v. Rogers*, *see* **Exhibit A**.

Judge Smith has intimate knowledge of the RI Judiciary's Incentive schemes and the RI Family Court's Incentive Schemes, including but not limited to the employees' incentive schemes as the State Court's Lead Legal Counsel prior to his judicial appointment. It is common knowledge in Rhode Island that he built the lucrative Public Law Practice at his firm Angel & Edwards that continues to count the state Appellees as key government clients.

Judge Smith's obstruction of the docketing of Appellant's post-judgment motions and his subsequent November 20, 2023 alteration of the record are calculated to and has the intended effect of covering up the 18 USC 4 reported activities that include 18 USC 666 violations alleged in the Amended Complaint, ECF 25.

Judge Smith knows fully well that the limited jurisdiction family court of Rhode Island lacks jurisdiction over federal claims that involve, *inter alia*, **18 USC 666** violative activities by Appellees RI OCSS, lacks jurisdiction to establish or enforce 12% compound interest on overdue support, whether in Rhode Island or in

Texas, disallowed under the State's Plan under 42 USC 654(21)(A), lacks

jurisdiction over fraud and theft committed by the RI OCSS Appellees and their

agents, including acts committed in Texas, and acts targeting Texas in violation of

Texas Civil and Penal Codes, certainly is disqualified to hear the family court's

own participation in the scheme.  At the minimum, Appellant raises in good faith

before the Court that Judge Smith appears to have attempted to and/or in fact aided

and abetted the theft of the United States by the Appellees, certainly theft of the

Appellant, through his Office, through a plain textual reading of the statutes, *inter

alia*, 18 USC 641; 18 USC 241; 18 USC 242; 18 USC 3; 18 USC 4; 18 USC 201,

1512, 1519(k); 18 USC 371, as have the Appellees, targeting Texas authorities and

federal authorities interstate.

### <u>No Immunity</u>

On February 6, 2024 in case No. 23-3228 in *UNITED STATES OF

AMERICA v. DONALD J. TRUMP*, DC Circuit, the DC Circuit Court reminds the

Court that Judges are similarly liable to the criminal laws for their official acts. A

notable example is *Ex parte Commonwealth of Virginia*, in which the Supreme

Court affirmed the criminal indictment of a judge based on an official act. 100 U.S.

339 (1879). A county judge was indicted in federal court for violating a federal

statute that prohibited discriminating on the basis of race in jury selection. *Id*. at

340, 344. The Supreme Court began by observing the principle that officers are

bound to follow the law: "We do not perceive how holding an office under a State,

and claiming to act for the State, can relieve the holder from obligation to obey the

Constitution of the United States, or take away the power of Congress to punish his

disobedience." *Id*. at 348. The Court then addressed the judge's argument that the

Court lacked the authority to punish a state judge for "his official acts." *Id*. Its

response was twofold. First, the Court described juror selection as "merely a

ministerial act, as much so as the act of a sheriff holding an execution, in

determining upon what piece of property he will make a levy, or the act of a

roadmaster in selecting laborers to work upon the roads." *Id*. The Court then

explained that even if juror selection is considered a "judicial act," the judge had a

legal duty to obey the criminal laws:

> "But if the selection of jurors could be considered
> in any case a judicial act, can the act charged
> against the petitioner be considered such when
> he acted outside of his authority and in direct
> violation of the spirit of the State statute? That
> statute gave him no authority, when selecting
> jurors, from whom a panel might be drawn for
> a circuit court, to exclude all colored men
> merely because they were colored. Such an
> exclusion was not left within the limits of his
> discretion. It is idle, therefore, to say that the

> act of Congress is unconstitutional because it
> inflicts penalties upon State judges for their
> judicial action. It does no such thing.

*Id.* at 348–49 (emphasis added). The Court's reference to "the State statute" is to the Virginia law charging the county judge with the duty to select jurors in the circuit and county courts. *Ex parte Virginia*, 100 U.S. at 340.

More recent case law on the judicial immunity doctrine affirms that judges are not immune from criminal liability for their official acts. *O'Shea v. Littleton* confirmed the holding of *Ex parte Virginia* in dismissing a civil rights action for equitable relief brought against a county magistrate and associate judge of a county circuit. 414 U.S. 488, 490–91, 503 (1974). The Supreme Court concluded that the requested injunction was not the only available remedy because both judges remained answerable to the federal criminal laws:

> *[W]e have never held that the performance of*
> *the duties of judicial, legislative, or executive*
> *officers, requires or contemplates the*
> *immunization of otherwise criminal deprivation*
> *of constitutional rights. On the contrary, the*
> *judicially fashioned doctrine of official*
> *immunity does not reach 'so far as to immunize*
> *criminal conduct proscribed by an Act of*
> *Congress . . . .'*

*Id.* at 503 (citation to *Ex parte Virginia*, 100 U.S. 339, omitted; quoting *Gravel*, 408 U.S. at 627). Similarly, in *Dennis v. Sparks*, the Court affirmed judicial immunity from civil money damages in the context of bribery allegations but explained that judges "are subject to criminal prosecutions as are other citizens." 449 U.S. at 31. Crucially, the judge in *Dennis* retained civil immunity because "the challenged conduct" — allegedly issuing an injunction corruptly after accepting bribes as part of a conspiracy — was "an official judicial act within his statutory jurisdiction, broadly construed." *Id.* at 29. The scope of civil judicial immunity thus aligns with civil Presidential immunity under Fitzgerald, but a judge has no criminal immunity for the same "official act." *See* also *Imbler v. Pachtman*, 424 U.S. 409, 429 (1976) ("Even judges, cloaked with absolute civil immunity for centuries, could be punished criminally for willful deprivations of constitutional rights . . . ."); *United States v. Gillock*, 445 U.S. 360, 372 (1980) ("[T]he cases in this Court which have recognized an immunity from civil suit for state officials have presumed the existence of federal criminal liability as a restraining factor on the conduct of state officials.").

When considering the criminal prosecutions of judges, other circuits have repeatedly rejected judicial criminal immunity for official acts, largely in the context of bribery prosecutions. *See United States v. Claiborne*, 727 F.2d 842,

845 (9th Cir.) (per curiam), cert. denied, 469 U.S. 829 (1984); *United States v.*

*Hastings*, 681 F.2d 706, 709–11 (11th Cir. 1982), cert. denied, 459 U.S. 1203

(1983); *United States v. Isaacs*, 493 F.2d 1124, 1143–44 (7th Cir.) (per curiam),

cert. denied, 417 U.S. 976 (1974), overruled on other grounds by

*United States v. Gimbel*, 830 F.2d 621 (7th Cir. 1987).

## CONCLUSION

**WHEREFORE**, the Appellant respectfully requests this Appeals

Court to GRANT the Appellant's herein Fed. R. App. P 27(b) and/or 1st Cir. Rule

27.0(d) Motion to Modify or Correct or Vacate the Court's February 16, 2024

Order to correctly show that the Appellant filed with the Clerk of the District Court

on November 16, 2023 one written Rule 59 Motion and one written Rule 60(b)

Motion within 28-days post-judgment from the final judgment dated October 19,

2023; the Appellant is appealing obstruction of docketing of Appellant's written

filings in the District Court that occurred on November 16th to November 17th of

2023;  The Appellant is appealing the district court's November 20, 2023 Order

altering the record by falsely docketing post-facto on November 20th Appellant's

motions filed on November 16, 2023 under the false entries on the docket under

the  date November 17, 2023, with the consequence this Court mistaking at first

glance Appellant's timely November 16, 2023 Rule 59 motions as filed out of

time; the Appellant is challenging on appeal/in Appellant's Notice of Appeal the null and void November 20, 2023 text order that further set in motion re-litigation of motions reviewed and considered then denied on November 17, 2023 by the district court, which denials were appealed on November 17, 2023.   The Appellant respectfully requests any and all relief.

Respectfully submitted,

Mary Seguin
Pro Se
/s/    *Mary Seguin*

Email: maryseguin22022@gmail.com
Phone: (281)744-2016
P.O. Box 22022
Houston, TX  77019

Dated: March 4, 2024

## CERTIFICATE OF SERVICE

This is to certify that the foregoing instrument has been served via the Court's ECF filing system on March 4, 2024, on all registered counsel of record, and has been transmitted to the Clerk of the Court.

Mary Seguin
Pro Se
/s/    *Mary Seguin*

Email: maryseguin22022@gmail.com
Phone: (281)744-2016
P.O. Box 22022
Houston, TX  77019

Exhibit A

No. 10-10

# In the Supreme Court of the United States

---

MICHAEL D. TURNER, PETITIONER

*v.*

REBECCA L. ROGERS, ET AL.

---

*ON WRIT OF CERTIORARI*
*TO THE SUPREME COURT OF SOUTH CAROLINA*

---

**BRIEF FOR THE UNITED STATES AS AMICUS CURIAE
SUPPORTING REVERSAL**

---

SALLY A. HOWARD
  *Acting General Counsel*
ROBERT E. KEITH
  *Associate General Counsel*
LISETTE PEDRE MESTRE
  *Attorney*
  *Department of Health and*
  *Human Services*
  *Washington, D.C. 20201*

NEAL KUMAR KATYAL
  *Acting Solicitor General*
  *Counsel of Record*
TONY WEST
  *Assistant Attorney General*
LEONDRA R. KRUGER
  *Acting Deputy Solicitor*
  *General*
JOSEPH R. PALMORE
  *Assistant to the Solicitor*
  *General*
LEONARD SCHAITMAN
EDWARD HIMMELFARB
  *Attorneys*
  *Department of Justice*
  *Washington, D.C. 20530-0001*
  *SupremeCtBriefs@usdoj.gov*
  *(202) 514-2217*

**QUESTIONS PRESENTED**

1. Whether the Court has jurisdiction to review the decision of the South Carolina Supreme Court.

2. Whether due process requires that the State provide counsel, at its expense, to an indigent parent in a child-support proceeding, when the parent is subject to a civil-contempt order for non-payment that may lead to confinement.

(I)

**TABLE OF CONTENTS**

Page

Interest of the United States . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
Summary of argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
Argument:
   I.   The Court has jurisdiction to review the decision of
        the South Carolina Supreme Court . . . . . . . . . . . . . . . 13
  II.  The absence of adequate procedures necessary
        to secure an accurate adjudication of civil
        contempt violated due process . . . . . . . . . . . . . . . . . . . 16
        A.  Confinement for civil contempt is
            permitted only when the contemnor is
            presently able to comply with the
            underlying order . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
        B.  The Family Court's procedures were
            inadequate to ensure an accurate
            determination of present ability to pay . . . . . . . . 19
        C.  Due Process can be satisfied by a variety of
            procedures intended to assure an accurate
            determination of present ability to pay in a
            civil contempt proceeding . . . . . . . . . . . . . . . . . . 23
            1.  Courts can comply with Due Process by
                providing a meaningful opportunity for an
                alleged contemnor to establish his present
                ability to pay . . . . . . . . . . . . . . . . . . . . . . . . . . 24
            2.  There is no basis for an inflexible right to
                counsel rule in civil contempt proceedings . . . 25
Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

(III)

IV

## TABLE OF AUTHORITIES

Cases:

*Alvarez* v. *Smith*, 130 S. Ct. 576 (2009) . . . . . . . . . . . . . . . 15

*Blessing* v. *Freestone*, 520 U.S. 329 (1997) . . . . . . . . . . . . . 3

*Cafeteria & Rest. Workers* v. *McElroy*, 367 U.S. 886
(1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Carlson* v. *Landon*, 342 U.S. 524 (1952) . . . . . . . . . . . . . . 32

*City of L.A.* v. *Lyons*, 461 U.S. 95 (1983) . . . . . . . . . . 14, 15

*DeFunis* v. *Odegaard*, 416 U.S. 312 (1975) . . . . . . . . . . . . 14

*First Nat'l Bank* v. *Bellotti*, 435 U.S. 765 (1978) . . . . . . . . 14

*Foucha* v. *Louisiana*, 504 U.S. 71 (1992) . . . . . . . . . . . . . . 20

*Gagnon* v. *Scarpelli*, 411 U.S. 778
(1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 25, 26, 27, 28, 29

*Gault, In re*, 387 U.S. 1 (1967) . . . . . . . . . . . . . . . . . . . . . . 26

*Gompers* v. *Buck's Stove & Range Co.*, 221 U.S. 418
(1911) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

*Hicks* v. *Feiock*, 485 U.S. 624 (1988) . . . . . . . . . . . . . . 17, 18

*Hodges* v. *Shalala*, 121 F. Supp. 2d 854 (D.S.C. 2000),
aff'd, 311 F.3d 316 (4th Cir. 2002), cert. denied,
540 U.S. 811 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

*INS* v. *Lopez-Mendoza*, 468 U.S. 1032 (1984) . . . . . . . . . 32

*International Union, United Mine Workers* v.
*Bagwell*, 512 U.S. 821 (1994) . . . . . . . . . . . . . . . . 18, 19, 26

*Landon* v. *Plasencia*, 459 U.S. 21 (1982) . . . . . . . . . . . . . 31

*Lassiter* v. *Department of Soc. Servs.*, 452 U.S. 18
(1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29

*Lujan* v. *G&G Fire Sprinklers, Inc.*, 532 U.S. 189
(2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Maggio* v. *Zeitz*, 333 U.S. 56 (1948) . . . . . . . . . . . . . . . 17, 18

*Mathews* v. *Eldridge*, 424 U.S. 319
(1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 19, 20, 25, 26, 29

V

Cases—Continued:                                             Page

*Middendorf* v. *Henry*, 425 U.S. 25 (1976) . . . . . 12, 26, 29, 31

*Mohammed* v. *Gonzales*, 400 F.3d 785 (9th Cir. 2005) . . . 32

*Morrissey* v. *Brewer*, 408 U.S. 471 (1972) . . . . . . . . . . . 19, 26

*Moseley* v. *Mosier*, 306 S.E.2d 624 (S.C. 1983) . . . . . . . . 17

*Murphy* v. *Hunt*, 455 U.S. 478 (1982) . . . . . . . . . . . . . 13, 14

*Nazakat* v. *INS*, 981 F.2d 1146 (10th Cir. 1992) . . . . . . . 33

*Olmstead* v. *L.C.*, 527 U.S. 581 (1999) . . . . . . . . . . . . . . . 15

*Shillitani* v. *United States*, 384 U.S. 364 (1966) . . . . . 11, 17

*Spencer* v. *Kemna*, 523 U.S. 1 (1998) . . . . . . . . . . . . . . 13, 14

*United States* v. *Bauer*, 956 F.2d 693 (7th Cir.),
    cert. denied, 506 U.S. 882 (1992) . . . . . . . . . . . . . . . . . . . 28

*United States* v. *Campos-Asencio*, 822 F.2d 506
    (5th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*United States* v. *Gasca-Kraft*, 522 F.2d 149 (9th Cir.
    1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*United States* v. *Rylander*, 460 U.S. 752 (1983) . . . . . . . . 18

*United States* v. *Torres-Sanchez*, 68 F.3d 227 (8th Cir.
    1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*United States Parole Comm'n* v. *Geraghty*,
    445 U.S. 388 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Vitek* v. *Jones*, 445 U.S. 480 (1980) . . . . . . . . . . . . . . . 26, 27

*Walters* v. *National Ass'n of Radiation Survivors*,
    473 U.S. 305 (1985) . . . . . . . . . . . . . . . . . . . . . . . . 29, 30, 31

*Weinstein* v. *Bradford*, 423 U.S. 147 (1975) . . . . . . . . . . . 14

*Wilkinson* v. *Austin*, 545 U.S. 209 (2005) . . . . . . . . . . . . . 19

*Yee* v. *City of Escondido*, 503 U.S. 519 (1992) . . . . . . . . . . 24

VI

Constitution, statutes and regulations:                    Page

U.S. Const.:

    Amend. V (Due Process Clause) . . . . . . . . . . . . . . . . 9, 19

    Amend. VI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 26, 27

    Amend. XIV (Due Process Clause) . . . . . . . . . . . . . . 19

Social Services Amendments of 1974, Pub. L.

No. 93-647, § 101(a), 88 Stat. 2351 (42 U.S.C. 651

*et seq.*) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3

    § 101(c)(5)(C), 88 Stat. 2360 . . . . . . . . . . . . . . . . . . . . 3

      42 U.S.C. 654(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      42 U.S.C. 654(6) (1976) . . . . . . . . . . . . . . . . . . . . . 3

      42 U.S.C. 654(8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      42 U.S.C. 654(16) . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      42 U.S.C. 654(24) . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      42 U.S.C. 654a(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      42 U.S.C. 654a(e)(1) . . . . . . . . . . . . . . . . . . . . . . . 6

      42 U.S.C. 654a(e)(4) . . . . . . . . . . . . . . . . . . . . . . . 6

      42 U.S.C. 654a(e)(5) . . . . . . . . . . . . . . . . . . . . . . . 6

      42 U.S.C. 654a(g)(1) . . . . . . . . . . . . . . . . . . . . . . . 6

      42 U.S.C. 655(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . 4

      42 U.S.C. 655(a)(2)(C) . . . . . . . . . . . . . . . . . . . . . . 2

      42 U.S.C. 655(a)(3)(A) . . . . . . . . . . . . . . . . . . . . . 4

      42 U.S.C. 655(a)(4) . . . . . . . . . . . . . . . . . . . . . . . . 6

      42 U.S.C. 656(a)(1) (1976) . . . . . . . . . . . . . . . . . . . 3

      42 U.S.C. 657(a)(4)(B) (1976) . . . . . . . . . . . . . . . . 3

      42 U.S.C. 657(b) (1976) . . . . . . . . . . . . . . . . . . . . . 3

      42 U.S.C. 666(a)(1)-(8) . . . . . . . . . . . . . . . . . . . . . . 4

VII

Statutes and regulations—Continued:                    Page

      42 U.S.C. 666(a)(3)(A) . . . . . . . . . . . . . . . . . . . . . . . 30

      42 U.S.C. 666(a)(7)(B)(i) . . . . . . . . . . . . . . . . . . . . 30

      42 U.S.C. 666(a)(8)(A)(iv) . . . . . . . . . . . . . . . . . . . 30

      42 U.S.C. 666(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      42 U.S.C. 666(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      42 U.S.C. 666(c)(1)(H) . . . . . . . . . . . . . . . . . . . . . . 30

Child Support Enforcement Amendments of 1984,
    Pub. L. No. 98-378,  98 Stat. 1329:

      § 6, 98 Stat. 1314 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      § 23(a)(2), 98 Stat. 1329 . . . . . . . . . . . . . . . . . . . . . . 4

      § 23(a)(5), 98 Stat. 1329 . . . . . . . . . . . . . . . . . . . . . . 4

Family Support Act of 1988, Pub. L. No. 100-485,
    102 Stat. 2343 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      § 123(a)(C), 102 Stat. 2352 . . . . . . . . . . . . . . . . . . . . 5

Personal Responsibility and Work Opportunity
    Reconciliation Act of 1996, Pub. L. No. 104-193,
    110 Stat. 2105 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      § 344(a)(2), 110 Stat. 2235 . . . . . . . . . . . . . . . . . . . . 6

Social Security Act Amendments of 1950, ch. 809,
    § 321(b), 64 Stat. 550 . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Social Security Amendments of 1967, Pub. L.
    No. 90-248, § 201(a)(1), 81 Stat. 877-879 . . . . . . . . . . . . 2

      § 201(a)(1), 81 Stat. 879 . . . . . . . . . . . . . . . . . . . . . . 3

8 U.S.C. 1229a(b)(4)(A) . . . . . . . . . . . . . . . . . . . . . . . 32

8 U.S.C. 1362 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

18 U.S.C. 3006A(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

28 U.S.C. 1257(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

42 U.S.C. 602(a)(26) (1976) . . . . . . . . . . . . . . . . . . . . . . 3

VIII

Statutes and regulations—Continued:                     Page

    42 U.S.C. 608(a)(3)(A) ............................ 5, 7

    42 U.S.C. 608(a)(7) ................................ 5

    45 C.F.R.:

        Section 302.70(a)(5)(iii) ......................... 30

        Section 303.5(g)(2)(iii) .......................... 30

        Section 303.6 (1975) ............................. 4

        Section 303.6 (1989) ............................. 5

        Section 303.20(c)(7) (1975) ....................... 4

        Section 303.20(c)(7) (1989) ....................... 5

        Section 303.100(a)(6) ............................ 30

        Section 303.100(f)(4) ............................ 30

        Section 303.101(c)(2) ............................ 30

        Section 303.102(c)(1) ............................ 30

        Section 303.104(b) .............................. 30

        Section 304.20(b)(3)(iv) .......................... 5

        Section 304.23(i) ............................... 30

        Section 304.23(j) ............................... 30

    Sup. Ct. R. 14.1(a) ................................ 24

    S.C. Rule of Family Ct.:

        R. 24 ......................................... 7

        R. 24(a) ....................................... 7

        R. 24(b) ....................................... 7

    S.C. Code Ann. (West):

        § 43-5-220(c) (Supp. 2009) ....................... 25

        § 43-5-235 (Supp. 2009) .......................... 7

        § 63-3-620 (2010) .............................. 7, 14

IX

Miscellaneous:                                           Page

    52 Fed. Reg. 32,130 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . 31

    U.S. Dep't of Health & Human Servs.:

        National Child Support Enforcement, *Strategic*
            *Plan: FY 2005-2009*, http://www.acf.hhs.gov/
            programs/cse/pubs/2004/Strategic_Plan_
            FY2005-2009.pdf . . . . . . . . . . . . . . . . . . . . . . . 21, 22, 23

        Office of Child Support Enforcement, *National*
            *Status of Automated Child Support Systems*,
            http://www.acf.hhs.gov/programs/
            cse/stsys/certmap.htm . . . . . . . . . . . . . . . . . . . . . . . . . 6

    Elizabeth G. Patterson, *Civil Contempt & the*
        *Indigent Child Support Obligor:  The Silent*
        *Return of Debtor's Prison*, 18 Cornell J.L. & Pub.
        Pol'y 95 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

    S. Rep. No. 387, 98th Cong., 2d Sess. (1984) . . . . . . . . . . 30

    Elaine Sorensen et al., *Assessing Child Support*
        *Arrears in Nine Large States & the Nation* (2007)
        http://aspe.hhs.gov/hsp/07/assessing-CS-debt/
        report.pdf . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

    South Carolina Dep't of Social Servs., *Response to*
        *Budget Proviso 13.27* (Aug. 31, 2007),
        http://www.scstatehouse.gov/reports/DSS/
        Provisoresponse1327_083107.doc . . . . . . . . . . . . . . . . . 6

# In the Supreme Court of the United States

No. 10-10

MICHAEL D. TURNER, PETITIONER

*v.*

REBECCA L. ROGERS, ET AL.

*ON WRIT OF CERTIORARI
TO THE SUPREME COURT OF SOUTH CAROLINA*

**BRIEF FOR THE UNITED STATES AS AMICUS CURIAE
SUPPORTING REVERSAL**

**INTEREST OF THE UNITED STATES**

This case concerns the due process protections that apply in a state civil contempt proceeding for non-payment of court-ordered child support. The state child-support enforcement program at issue in the case, like that in every other State, is part of one of the largest cooperative federal-state programs, established under the Social Services Amendments of 1974 (1975 Act), Pub. L. No. 93-647, § 101(a), 88 Stat. 2351 (42 U.S.C. 651 *et seq.*) (adding Title IV-D to the Social Security Act). The program, which is administered by the Secretary of Health and Human Services (Secretary), provides that States with approved plans for child and spousal support that meet federal requirements are reimbursed by the federal government for 66% of the costs of operating their child-support enforcement programs. 42 U.S.C.

(1)

2

655(a)(2)(C). The United States has a substantial interest in the effective and equitable operation of such child-support programs.

**STATEMENT**

1. This case involves proceedings in South Carolina family court to enforce a child-support order entered against petitioner for the support of his and respondent Rogers' minor child. South Carolina, like every other State, maintains a child-support enforcement program as a condition of receiving federal funding for its Temporary Assistance for Needy Families program. Since Congress first required States receiving federal funds to undertake child-support enforcement efforts, it has shifted its emphasis from a localized, court-based enforcement approach to centralized and automated efforts. South Carolina, however, maintains a localized, court-based approach to child-support enforcement.

a. Congress first required States receiving federal funds to establish child-support enforcement programs in 1950, pursuant to the Aid to Families with Dependent Children (AFDC) program. See Social Security Act Amendments of 1950, ch. 809, § 321(b), 64 Stat. 550 (requiring States receiving AFDC funds to "provide for prompt notice to appropriate law-enforcement officials of the furnishing of aid to dependent children in respect of a child who has been deserted or abandoned by a parent"). In 1968, Congress required States participating in AFDC to create statewide or local "organizational unit[s]" for establishing paternity and collecting child support. Social Security Amendments of 1967, Pub. L. No. 90-248, § 201(a)(1), 81 Stat. 877-879. It also required States to "provide for entering into cooperative arrangements with appropriate courts and law enforce-

3

ment officials * * * to assist" with administration of
the program. *Id.* § 201(a)(1), 81 Stat. 879.

b.  In 1975, Congress adopted Title IV-D, 42 U.S.C.
651 *et seq.*, and established the general statutory frame-
work that exists today.  See 1975 Act § 101(a), 88 Stat.
2351; *Blessing* v. *Freestone*, 520 U.S. 329, 333-335 (1997)
(describing program).  The 1975 Act required States
participating in AFDC to "have in effect a plan ap-
proved" by the Secretary under Title IV-D and to "op-
erate a child support program in conformity with such
plan."  1975 Act § 101(c)(5)(C), 88 Stat. 2360.  In particu-
lar, each State was required to provide services to locate
noncustodial parents and to establish the paternity of,
and secure support for, children receiving AFDC bene-
fits.  42 U.S.C. 654(4).

Under the 1975 Act, AFDC recipients were required
to assign their support rights to the State and cooperate
in enforcement efforts.  42 U.S.C. 602(a)(26) (1976).
Amounts recovered generally were retained by the State
to reimburse it and the federal government for AFDC
assistance provided to the child's family.  42 U.S.C.
657(b) (1976).  Once assigned, the support obligation was
owed to the State and was collectible under all applica-
ble state processes.  42 U.S.C. 656(a)(1) (1976).[1]

The Secretary's regulations implementing the 1975
Act reflected a localized, court-centered approach to
enforcement.  States' efforts to collect past-due child
support were required to include ("as applicable and
necessary"):  "[c]ontempt proceedings to enforce an ex-
tant court order," court-ordered wage garnishment, and

---

[1]  Congress required States to provide services to non-AFDC families
as well, 42 U.S.C. 654(6) (1976), although those families were not requi-
red to assign their support rights and any child support the State collec-
ted was paid to the family, 42 U.S.C. 657(a)(4)(B) (1976).

4

attachment of real and personal property. 45 C.F.R. 303.6 (1975). States were also required to maintain sufficient staff (either statewide or locally) to "enforce collection of support" by "executing contempt proceedings, wage assignments, obtaining garnishment orders, attaching real and personal property, criminal prosecution and executing judgments." 45 C.F.R. 303.20(c)(7) (1975).

c. In 1984, Congress found that there remained "a critical lack of child support enforcement," which had "a critical impact on the health and welfare of the children of the Nation." Child Support Enforcement Amendments of 1984 (1984 Amendments), Pub. L. No. 98-378, § 23(a)(2) and (5), 98 Stat. 1329. The 1984 Amendments required States to adopt laws and procedures providing for, among other things, (i) mandatory wage withholding; (ii) expedited processes for obtaining and enforcing support orders; (iii) state income tax refund intercepts; and (iv) reporting overdue support to consumer credit agencies. 42 U.S.C. 666(a)(1)-(8) and (b).

Congress ultimately set the federal share of reimbursable expenditures at 66%, 42 U.S.C. 655(a)(2), but expanded the availability of matching funds at the 90% level for (optional) State expenditures for automating data processing systems to improve "the monitoring of support payments, the maintenance of accurate records regarding the payment of support, and the prompt provision of notice to appropriate officials with respect to any arrearages in support payments which may occur." 1984 Amendments § 6, 98 Stat. 1314; 42 U.S.C. 654(16); 655(a)(3)(A).

d. Congress amended Title IV-D again in 1988 to improve the rate of child-support collection. Family Support Act of 1988 (1988 Act), Pub. L. No. 100-485,

5

102 Stat. 2343. Because effective child-support enforce-
ment "had long been thwarted by localized enforcement
systems that were unable to quickly and effectively
track delinquent parents who crossed county and state
lines," *Hodges* v. *Shalala*, 121 F. Supp. 2d 854, 874
(D.S.C. 2000), aff'd, 311 F.3d 316 (4th Cir. 2002), cert.
denied, 540 U.S. 811 (2003), Congress in the 1988 Act
emphasized centralized, automated record-keeping and
information retrieval in order to improve collection
rates. In particular, Congress mandated "automated
data processing and information retrieval system[s]"
that had previously been optional. 1988 Act § 123(a)(C),
102 Stat. 2352; 42 U.S.C. 654(24).

The Title IV-D regulations were amended after
adoption of the 1988 Act. As amended, the regulations
omitted specific references to contempt proceedings as
required means for enforcing child-support obligations.
See 45 C.F.R. 303.6, 303.20(c)(7) (1989);[2] cf. pp. 3-4, *su-
pra*.

e. Finally, Congress made further changes to the
child-support enforcement system in the Personal Re-
sponsibility and Work Opportunity Reconciliation Act of
1996 (1996 Act), Pub. L. No. 104-193, 110 Stat. 2105,
which, among other things, replaced AFDC with the
block-grant program called Temporary Assistance for
Needy Families (TANF).[3] Those changes again empha-
sized a centralized, automated approach to child-support

---

[2] Federal financial support remained available for "[e]nforcement of
a support obligation" through a variety of means, including contempt
citations. 45 C.F.R. 304.20(b)(3)(iv).

[3] The 1996 Act also imposed a five-year cap on benefits. 42 U.S.C.
608(a)(7). As before, a custodial parent is required to assign her rights
to child support to the State as part of the application for TANF assis-
tance. 42 U.S.C. 608(a)(3)(A).

6

enforcement.  The amended statute established detailed requirements for the "statewide automated data processing and information retrieval systems" made mandatory in 1988.  *Id.* § 344(a)(2), 110 Stat. 2235, 42 U.S.C. 654a(a).  Among other things, the system must include a state case registry that includes every child-support case in the State, including the amount of monthly support owed and collected in all cases administered by the state agency.  42 U.S.C. 654a(e)(1) and (4); see 42 U.S.C. 654a(e)(5) (States must "promptly * * * update" case records when circumstances change).  The States are required to use their centralized databases "to the maximum extent feasible, to assist and facilitate the collection and disbursement of support payments," including by establishing wage-withholding orders and sending wage-withholding notices to employers.  42 U.S.C. 654a(g)(1); see 42 U.S.C. 666(c).

f.   Despite the changes in federal law, South Carolina maintains a localized, court-based approach to child-support enforcement.  It is the only State that does not have a certified automated system.  See Office of Child Support Enforcement, U.S. Dep't of Health & Human Servs., *National Status of Automated Child Support Systems*, http://www.acf.hhs.gov/programs/cse/stsys/ certmap.htm.[4]

---

[4]   In the 1996 Act, Congress determined that any State that failed to automate its child-support program should incur substantial penalties. 42 U.S.C. 655(a)(4).  In 2000, South Carolina unsuccessfully challenged the Department of Health and Human Services' (HHS) authority to impose a penalty for its non-compliance, see *Hodges* v. *Shalala*, *supra*, and subsequently submitted a corrective-action plan and accepted imposition of a penalty retroactive to 1998.  The State paid more than $55 million in penalties through 2007.  South Carolina Dep't of Social Servs., *Response to Budget Proviso 13.27* at 4 (Aug. 31, 2007), http://www.scstatehouse.gov/reports/DSS/Provisoresponse1327_

7

Acting pursuant to express statutory authority, S.C. Code Ann. § 43-5-235 (West Supp. 2009), the State's Department of Social Services has contracted with county clerks of court across the State to administer its program. The South Carolina courts have in turn adopted a special rule governing child-support enforcement. See S.C. Rule of Family Ct. 24 (S.C. Rule 24). The rule requires clerks of court to review on a monthly basis "all child support and periodic alimony accounts paid through the clerk of court," as are all accounts for children whose custodial parent receives TANF assistance. S.C. Rule 24(a); see 42 U.S.C. 608(a)(3)(A). When any such account is in arrears, the clerk is required to "issue a rule to show cause and an affidavit identifying the order of the court which requires such payments to be made and the amount of the arrearage [and] directing the party in arrears to appear in court at a specific time and date" to face contempt proceedings. S.C. Rule 24(b).

A "wilful[]" violation of a "lawful order" of a South Carolina court constitutes contempt and may subject the contemnor to up to 12 months confinement. S.C. Code Ann. § 63-3-620 (West 2010).

2. Respondent Rogers and petitioner are the parents of a minor child, B.L.P. In 2003, the family court in Oconee County, South Carolina, entered an Order of Financial Responsibility against petitioner. Although the order noted that petitioner was unemployed, the court imputed a gross monthly income of $1386 to him and ordered him to pay $59.72 a week in child support through the court. Pet. App. 22a; see *id.* at 19a-24a, 25a.

---

083107.doc. We are informed by HHS that the State has now paid a total of more than $72 million in penalties to date and currently owes an additional incurred penalty of more than $10 million for fiscal year 2010.

8

Because respondent Rogers was receiving public assistance, she assigned her right to collect child support to the Department of Social Services. Pet. Br. 8; see *id.* at 9 n.6 (payments were remitted to respondent Rogers starting in 2004 because her benefits had ended but her case continued to be administered as a Title IV-D case). Petitioner fell behind on his payments, received a number of rules to show cause from the court clerk why he should not be held in contempt, and was jailed three times as a result. *Id.* at 9-10.

By 2007, petitioner was $5728.76 behind on his child-support payments, and a judge of the Oconee County Family Court issued a bench warrant for his arrest. Pet. App. 6a; Pet. Br. 8-9. A hearing was held on January 3, 2008. After noting petitioner's outstanding balance and stating that he had not made a payment since August 2006, the judge asked petitioner, "[i]s there anything you want to say?" *Id.* at 17a. Petitioner responded:

> Well, when I first got out, I got back on dope. I done meth, smoked pot and everything else, and I paid a little bit here and there. And, when I finally did get to working, I broke my back, back in September. I filed for disability and SSI. And, I didn't get straightened out off the dope until I broke my back and laid up for two months. And, now I'm off the dope and everything. I just hope that you give me a chance. I don't know what else to say. I mean, I know I done wrong, and I should have been paying and helping her, and I'm sorry. I mean, dope had a hold to me.

*Ibid.*

9

After a brief exchange between petitioner and respondent about his SSI application, the court said:

> If there's nothing else, this will be the Order of the Court. I find the Defendant in willful contempt. I'm gonna sentence him to twelve months in the Oconee County Detention Center. He may purge himself of the contempt and avoid the sentence by having a zero balance on or before his release.

Pet. App. 18a. The court made no finding that petitioner was capable of paying the arrears while incarcerated. See *id.* at 17a-18a.

At this hearing, neither petitioner nor respondent Rogers was represented by counsel. Pet. App. 6a. However, pro bono counsel filed an appeal on petitioner's behalf, alleging that petitioner had a right under the Sixth Amendment and the Due Process Clause to have appointed counsel in the contempt proceeding. *Id.* at 10a-15a. Before the intermediate state court could rule, the South Carolina Supreme Court granted discretionary review and affirmed the family court. *Id.* at 1a-5a.

The court noted that the "purpose of civil contempt is to coerce the defendant to comply with the court's order," while criminal contempt's purpose is "to punish a party for disobedience or disrespect." Pet. App. 2a-3a. "Civil contempt sanctions are conditioned on compliance with the court's order. * * * A contemnor imprisoned for civil contempt is said to hold the keys to his cell because he may end the imprisonment and purge himself of the sentence at any time." *Id.* at 3a. The court recognized that the "distinction between civil and criminal contempt is crucial because criminal contempt triggers additional constitutional safeguards not mandated in civil contempt proceedings." *Ibid.*

The court noted that in this case the family court had said that petitioner could "purge himself of the contempt" by achieving a "zero balance" on his arrearage. Pet. App. 3a. Reasoning that "[t]his conditional sentence is a classic civil contempt sanction," the court concluded that petitioner had no right to appointed counsel. *Ibid.*

## SUMMARY OF ARGUMENT

1. The Court has jurisdiction to review the decision of the South Carolina Supreme Court. Petitioner has completed his term of confinement for civil contempt and has not identified any collateral consequences flowing from the contempt. Those facts would ordinarily render his case moot. Petitioner, however, qualifies for a narrow exception to the mootness doctrine because the controversy is capable of repetition yet evading review. Sentences for civil contempt in South Carolina are limited to 12 months, and it is highly unlikely that petitioner would be able to secure plenary review by this Court within any future period of confinement. In addition, the constitutional violation petitioner asserts is capable of repetition because he remains subject to the underlying child-support order and still has substantial arrears. There is thus a reasonable expectation that he will receive automatically-generated rules to show cause for contempt in the future. Indeed, since the contempt at issue in this case, petitioner has been jailed again for civil contempt.

2. Petitioner's confinement for civil contempt violated due process, not because he lacked counsel, but because the procedures employed by the family court were inadequate to ensure the accurate determination of petitioner's present ability to pay his child-support ar-

11

rears. That ability to pay was a necessary predicate to the civil contempt sanction.

The defining feature of confinement for civil contempt is its purpose to coerce compliance with a court order. Such confinement must therefore end upon discharge of the contemnor's obligations; he is said to hold "the keys of [his] prison in [his] own pocket[]." *Shillitani* v. *United States*, 384 U.S. 364, 368 (1966) (citation omitted). Such confinement may not be imposed, however, where the contemnor demonstrates his inability to comply with the order. In such cases, he does not truly hold the keys to the prison; to confine him nonetheless would render the confinement punitive and thus a sanction that may be imposed only after compliance with criminal case safeguards.

The question of petitioner's ability to pay his child-support arrears therefore should have been a focus of the civil contempt proceeding, but it was not. Pro se petitioner was afforded no meaningful opportunity to establish his indigency, and even after he made a statement that could have easily been understood to mean he had no present ability to pay nearly $6000 to avoid jail, the family court judge made no further inquiry on the matter before committing him to a nominally conditional term of confinement.

The proceeding did not comply with due process because there was a serious risk of erroneous deprivation of petitioner's liberty through the procedures employed and because additional procedures would have enhanced the accuracy of the proceeding without materially impinging on any governmental interest. See *Mathews* v. *Eldridge*, 424 U.S. 319, 335 (1976). Provision of counsel would have been a sufficient, but not a necessary, means of satisfying due process in this case. There were other

12

means of providing petitioner with a meaningful opportunity to establish his present inability to pay, such as asking him to complete an understandable form seeking his financial information, or asking him questions on the topic as necessary at a hearing. In the typical case, providing basic information about one's personal finances is not the kind of undertaking that requires assistance of counsel, and due process protections are based on the requirements of the mine-run case, not the exceptional one.

There is no basis for petitioner's proposed categorical due process right to appointed counsel in civil contempt proceedings where confinement is imposed. The Court has declined to recognize a categorical constitutional right to appointed counsel in the context of other non-criminal proceedings that can result in confinement. *Gagnon* v. *Scarpelli*, 411 U.S. 778, 782-790 (1973) (probation revocation); *Middendorf* v. *Henry*, 425 U.S. 25, 43 (1976) (summary court-martial). Civil contempt proceedings in child-support cases are relatively brief; the custodial parent may not be represented by counsel; and the issues in dispute are generally not complex. Given those circumstances, there is no warrant for recognizing a categorical right to defense counsel in such proceedings. Finally, recognizing a due process right to counsel in such proceedings would upset the balance struck by Title IV-D and its implementing regulations, both of which stress the importance of due process protections in child-support proceedings but neither of which permit federal funding for provision of counsel.

13

**ARGUMENT**

**I.  THE COURT HAS JURISDICTION TO REVIEW THE DE-CISION OF THE SOUTH CAROLINA SUPREME COURT**

Although petitioner has completed his term of confinement for the civil contempt at issue here, his claim is not moot because he remains subject to the underlying child-support order and because there is a reasonable expectation that he will face future contempt proceedings.  His claim thus avoids mootness because it is capable of repetition yet evading review.  This Court thus has jurisdiction to review the final judgment of the South Carolina Supreme Court.  See 28 U.S.C. 1257(a).

1.  "In general a case becomes moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome."  *Murphy* v. *Hunt*, 455 U.S. 478, 481 (1982) (internal quotation marks omitted) (quoting *United States Parole Comm'n* v. *Geraghty*, 445 U.S. 388, 396 (1980)).  While a currently confined individual's challenge to his confinement generally presents no question of mootness, an individual who has been released from confinement ordinarily may continue to press his challenge only if he suffers some "collateral consequence" that constitutes a "concrete and continuing injury."  *Spencer* v. *Kemna*, 523 U.S. 1, 7 (1998).  Because this Court "ha[s] been willing to presume that a wrongful conviction has continuing collateral consequences," the Court ordinarily will not dismiss as moot a criminal defendant's challenge to his conviction once the defendant has completed his term of imprisonment.  *Id.* at 8.  But the Court has not employed that presumption in other contexts, instead requiring a party not in custody to demonstrate that he will actually face collateral consequences if he does not secure relief

14

on appeal.  See *id.* at 14 (no presumption of collateral consequences for parole revocation); see also *id.* at 14-16 (reviewing party's claimed collateral consequences).

Petitioner has completed his term of confinement for civil contempt.  Because he challenges a civil order, not a criminal conviction, no presumption of collateral consequences applies.  Moreover, petitioner has not identified any collateral consequences flowing from the finding of civil contempt.  Ordinarily, petitioner's challenge to that finding would be considered moot and beyond this Court's jurisdiction.

2.  Petitioner's claim in this case, however, avoids mootness because his is one of the "exceptional situations" in which a claim is capable of repetition, yet evading review.  *City of L.A.* v. *Lyons*, 461 U.S. 95, 109 (1983).  In non-class actions, this doctrine requires satisfaction of two elements:  "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party would be subjected to the same action again."  *Murphy*, 455 U.S. at 482 (quoting *Weinstein* v. *Bradford*, 423 U.S. 147, 149 (1975) (per curiam)).  Petitioner satisfies both elements.

First, confinement for civil contempt in South Carolina is limited to 12 months, S.C. Code Ann. § 63-3-620 (West 2010), and it is exceedingly unlikely that a contemnor could appeal through the South Carolina court system, petition this Court for a writ of certiorari, and receive a decision on his claim within such a limited time period.  See, *e.g.*, *First Nat'l Bank* v. *Bellotti*, 435 U.S. 765, 774 (1978) (18 months was "too short a period of time for appellants to obtain complete judicial review"); cf. *DeFunis* v. *Odegaard*, 416 U.S. 312, 319 (1975) (per curiam) (future challenge to law school

admission procedure could likely come to this Court for decision within three-year period of law school matriculation). Indeed, in this case, petitioner had completed his term of imprisonment for civil contempt more than a year before the South Carolina Supreme Court rendered its decision. Compare Pet. App. 8a with *id.* at 1a.

Second, petitioner "can make a reasonable showing that he will again be subjected to the alleged illegality." *Lyons*, 461 U.S. at 109. Petitioner is still subject to the underlying order for child support, and he is nearly $14,000 in arrears. Pet. Br. 15; J.A. 104a. Given that clerks of court in South Carolina automatically issue rules to show cause when a non-custodial parent is late on a required payment, there is a reasonable expectation that petitioner will again be subject to contempt proceedings. Indeed, after he was released from jail for the contempt at issue here, petitioner was again held in contempt and reincarcerated. In May 2010 yet another rule to show cause for contempt issued due to failure to pay support to respondent. Pet. Br. 13-15; see *id.* at 15 (May 2010 rule to show cause is still outstanding); see also *Olmstead* v. *L.C.*, 527 U.S. 581, 594 n.6 (1999) (suit by plaintiffs seeking community-based services rather than institutionalization not moot even though they were then receiving desired services, because of "the multiple institutional placements [they] ha[d] experienced"). This is thus far from "an abstract dispute about the law" that might be thought "unlikely to affect [petitioner] any more than it affects other [South Carolina] citizens." *Alvarez* v. *Smith*, 130 S. Ct. 576, 580 (2009).[5]

---

[5] That petitioner was represented by pro bono counsel in a subsequent contempt proceeding involving a different support order, see Pet. Br. 15 n.10, does not mean his claim is incapable of repetition. Were pro bono counsel bound to represent petitioner in every future contempt

16

## II. THE ABSENCE OF ADEQUATE PROCEDURES NECESSARY TO SECURE AN ACCURATE ADJUDICATION OF CIVIL CONTEMPT VIOLATED DUE PROCESS

The validity of the civil contempt order against petitioner turned on a critical fact: his present ability to purge himself of contempt by paying off his past-due child support. The family court's procedures in this case violated due process because they were inadequate to ensure an accurate determination of that fact and thus prevent an erroneous deprivation of petitioner's liberty. Although provision of government-provided counsel would have been a sufficient means of complying with due process requirements in this case, it was not a necessary one. Other mechanisms, such as requiring an affidavit for disclosure of financial information and a preliminary assessment of petitioner's current ability to pay child support, would have satisfied the requirements of due process.

### A. Confinement For Civil Contempt Is Permitted Only When The Contemnor Is Presently Able To Comply With The Underlying Order

Both civil and criminal contempt can lead to confinement, but this Court has long distinguished the two based on the "character and purpose" of the sanction imposed. *Gompers* v. *Buck's Stove & Range Co.*, 221 U.S. 418, 441 (1911). In civil contempt, the "punishment * * * [is] remedial," in that it is intended to "coerc[e]

---

proceeding, then his claim of entitlement to the assistance of counsel would be moot. There is no indication in the record, however, that pro bono counsel is under any such obligation and, in fact, counsel did not appear in a 2009 contempt proceeding involving support owed respondent, see *id.* at 13-14 (noting that petitioner appeared pro se in 2009 and served six months for civil contempt).

17

the defendant to do what he had refused to do." *Id.* at 442.  Punishment for criminal contempt, on the other hand, is "punitive" and is imposed "to vindicate the authority of the court." *Id.* at 441.

Because of that fundamental distinction, confinement imposed for civil contempt is conditional.  The sentence must include a purge clause under which the contemnor will be immediately released upon compliance with the underlying court order. *Hicks* v. *Feiock*, 485 U.S. 624, 634 (1988).  When confined under such a civil contempt order, the contemnor holds "the keys of [his] prison in [his] own pocket[ ]." *Shillitani* v. *United States*, 384 U.S. 364, 368 (1966) (citation omitted); see *id.* at 370 ("While any imprisonment, of course, has punitive and deterrent effects, it must be viewed as remedial if the court conditions release upon the contemnor's willingness" to comply with a court order.).

A purge clause by itself, however, will not render the contemnor's confinement remedial rather than punitive because "the justification for coercive imprisonment as applied to civil contempt depends upon the ability of the contemnor to comply with the court's order." *Shillitani*, 384 U.S. at 370-371.  Accordingly, "punishment may not be imposed in a civil contempt proceeding when it is clearly established that the alleged contemnor is unable to comply with the terms of the order." *Hicks*, 485 U.S. at 638 n.9; see *Maggio* v. *Zeitz*, 333 U.S. 56, 72 (1948) ("[T]o jail one for a contempt for omitting an act he is powerless to perform would * * * make the proceeding purely punitive, to describe it charitably."); see also *Moseley* v. *Mosier*, 306 S.E.2d 624, 626 (S.C. 1983)

18

("When the parent is *unable* to make the required payments, he is not in contempt.").[6]

The burdens of production and persuasion may be placed on the defendant to demonstrate his present inability to comply with an order. See *Hicks*, 485 U.S. at 637; *United States* v. *Rylander*, 460 U.S. 752, 757 (1983). Accordingly, if the defendant "offers no evidence as to his inability to comply," "stands mute," or is disbelieved by the court, then he fails to carry his burden and may be held in contempt. *Maggio*, 333 U.S. at 75. But the trial court "is obliged" to consider "all the evidence properly before it in the contempt proceeding in determining whether or not there is actually a present ability to comply and whether failure so to do constitutes deliberate defiance which a jail term will break." *Id.* at 76.

If, upon examination, a contempt penalty is considered punitive rather than remedial, it will be vacated unless all "the protections that the Constitution requires of * * * criminal proceedings" were provided. *International Union, United Mine Workers* v. *Bagwell*, 512 U.S. 821, 826 (1994) (quoting *Hicks*, 485 U.S. at 632).

---

  [6]  A defendant may not avoid a finding of civil contempt for violating an order by collaterally attacking that order in the contempt proceeding. See *Maggio*, 333 U.S. at 74-75. The defendant may, however, make the distinct assertion that he has a "*present* inability to comply with the order in question." *United States* v. *Rylander*, 460 U.S. 752, 757 (1983); see *ibid.* ("While the court is bound by the enforcement order, it will not be blind to evidence that compliance is now factually impossible. Where compliance is impossible, neither the moving party nor the court has any reason to proceed with the civil contempt action."); *Maggio*, 333 U.S. at 74-75.

19

### B. The Family Court's Procedures Were Inadequate To Ensure An Accurate Determination Of Present Ability To Pay

The procedures employed by the family court violated petitioner's due process rights because they were inadequate to ensure that petitioner was not erroneously confined as an inducement to perform a task he was powerless to perform, while additional procedures to ensure petitioner's present ability to pay his child-support arrears would have been minimally burdensome.

"Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews* v. *Eldridge*, 424 U.S. 319, 332 (1976). Confinement for civil contempt is a deprivation of liberty, and the alleged contemnor is thus entitled to procedural due process protections before its imposition. Cf. *Morrissey* v. *Brewer*, 408 U.S. 471, 482 (1972) (termination of parole triggers due process protections); see also *Bagwell*, 512 U.S. at 827 (civil contempt requires "notice and an opportunity to be heard").

The conclusion that due process applies is the beginning of the inquiry, not its end, because "the requirements of due process are 'flexible and cal[l] for such procedural protections as the particular situation demands.'" *Wilkinson* v. *Austin*, 545 U.S. 209, 224 (2005) (brackets in original) (quoting *Morrissey*, 408 U.S. at 481). The Court has "generally * * * declined to establish rigid rules and instead ha[s] embraced a framework to evaluate the sufficiency of particular procedures." *Ibid.* That framework involves "consideration of three distinct factors:

20

First, the private interest that will be affected by the
official action; second, the risk of an erroneous depri-
vation of such interest through the procedures used,
and the probable value, if any, of additional or substi-
tute procedural safeguards; and finally, the Govern-
ment's interest, including the function involved and
the fiscal and administrative burdens that the addi-
tional or substitute procedural requirements would
entail.

*Mathews*, 424 U.S. at 335.

Application of the *Mathews* factors here demon-
strates that the family court proceeding did not comply
with the requirements of procedural due process. First,
petitioner's private interest in avoiding incarceration
was significant. See *Foucha* v. *Louisiana*, 504 U.S. 71,
80 (1992).

Second, there was a serious "risk of an erroneous
deprivation" of petitioner's liberty interest under the
procedures employed by the family court, and there
would have been value in additional procedures.
*Mathews*, 424 U.S. at 335. Petitioner did not dispute
that he had failed to comply with his child-support or-
der, so the propriety of his confinement for civil con-
tempt thus turned on his present ability to do so. See
pp. 17-18, *supra*; Pet. Br. 3-4 (petitioner's ability to pay
"was the precise question before the family court"); *id.*
at 17. But South Carolina automatically referred peti-
tioner for contempt proceedings without considering
whether petitioner was employed or had assets. At the
contempt hearing, the court solicited no financial infor-
mation from petitioner, nor was there apparently any
mechanism in place for him to provide it on his own. Pe-
titioner's statement at the hearing that he had been un-

21

able to work because he broke his back, Pet. App. 17a, could reasonably be understood to constitute a claim that he had no present ability to pay nearly $6000. The court did not explore this question, however; it made no inquiry into petitioner's income or assets. Instead, the court imposed a jail sentence unaccompanied by any finding that petitioner had the ability to pay off his outstanding balance from a jail cell.[7] Taking additional modest steps to determine whether petitioner had the present ability to discharge his obligation, see pp. 24-25, *infra*, would have improved the accuracy of the proceeding.

Finally, the government's interests also favor additional procedural safeguards to ensure that only those parents with a present ability to pay are confined for civil contempt. While the State has a strong interest in enforcing child-support orders, it secures no benefit from jailing a non-custodial parent who cannot discharge his obligation. The period of incarceration makes it less, rather than more, likely that such parent will be able to pay child support. See Elizabeth G. Patterson, *Civil Contempt & the Indigent Child Support Obligor: The Silent Return of Debtor's Prison*, 18 Cornell J.L. & Pub. Pol'y 95, 126 (2008) (*Civil Contempt*). Meanwhile, the State incurs the substantial expense of confinement.

Moreover, as a general matter, the routine use of contempt for non-payment of child support is likely to be an ineffective strategy for enforcing support orders. See National Child Support Enforcement, U.S. Dep't of Health & Human Servs., *Strategic Plan: FY 2005-2009*, at 2, 10 (*Strategic Plan*), http://www.acf.hhs.gov/

---

[7] The judge told petitioner, "[i]f you've got a job, I'll make you eligible for work release," Pet. App. 18a, but petitioner states he was ineligible for work release, Pet. Br. 12 n.8.

22

programs/cse/pubs/2004/Strategic_Plan_FY2005-2009.
pdf. While child-support recovery efforts once "followed
a business model predicated on enforcement" that "intervened only after debt, at times substantial, accumulated and often too late for collection to be successful, let alone of real value to the child," experience has shown that alternative methods—such as order modifications, increased contact with non-custodial parents, and use of "automation to detect non-compliance as early as possible"—are more effective. *Id.* at 2.

A substantial portion of child-support obligors have no or low reported income. Elaine Sorensen et al., *Assessing Child Support Arrears in Nine Large States & the Nation* 22 (2007) (*Assessing Child Support Arrears*), http://aspe.hhs.gov/hsp/07/assessing-CS-debt/report.pdf (obligors with $10,000 or less in annual income constituted half of the child-support obligors and owed 70% of the arrears in a nine-state study). Such individuals' child-support obligations are often substantial. See *id.* at 54 ("For obligors with reported income of $10,000 a year or less, the median percent of reported income that was due as current support was 83[%].") A low-income individual in arrears on child-support payments is "rarely a candidate for civil incarceration because of the likelihood that he or she is unable to pay the hefty sum represented by the accumulated arrears, or even a portion thereof that may be set by the court as the purge amount." *Civil Contempt* 116.[8]

---

[8] To be sure, coercive enforcement remedies, such as contempt, have a role to play in child-support enforcement efforts, such as with non-custodial parents who are hiding assets or unreported self-employment or under-the-table income. See *Strategic Plan* 2; *Assessing Child Support Arrears* 4-5, 22-23, 25; *Civil Contempt* 97. There is no evi-

23

Many States have taken alternative steps to avoid child-support arrears, such as establishing more realistic support orders, "increas[ing] parental participation in the order establishment process," providing employment services to non-custodial parents, or using automation tools to improve wage withholding. *Assessing Child Support Arrears* 10-11, 80-89; see *id.* at 85 (study of Florida program that provides employment services and case management to non-custodial parents found that program participants paid nearly five dollars in child support for every dollar spent on the program). Such alternatives, which focus on early intervention rather than after-the-fact efforts to collect substantial accumulated arrears, are more likely to be effective means of enforcing the child-support obligations of the substantial number of low-income obligors. See *Strategic Plan* 2.

### C. Due Process Can Be Satisfied By A Variety Of Procedures Intended To Assure An Accurate Determination Of Present Ability To Pay In A Civil Contempt Proceeding

Petitioner argues that, in order to ensure that his civil contempt proceeding "remain[ed] civil," Pet. Br. 39, due process required the appointment of counsel to assist him in establishing his inability to comply with the court's order, see *id.* at 41. Although we agree that petitioner's due process rights were violated, we disagree that the State's failure to appoint counsel was itself the basis of the violation. Appointment of counsel is certainly one way to help ensure an accurate determination of the obligor's current ability to pay—the determination on which the "civil" nature of a civil contempt sanction rests—but it is not the only way. It was the State's

---

dence, however, that routine use of contempt among low-income non-custodial parents is generally effective. See *Civil Contempt* 126.

failure to provide any meaningful mechanism for making that determination in this case, and not its failure to provide counsel in particular, that violated petitioner's due process rights.[9]

> 1. **Courts can comply with due process by providing a meaningful opportunity for an alleged contemnor to establish his present ability to pay**

While there is no basis for a constitutional rule categorically requiring appointment of counsel in all civil contempt that could lead to deprivation of physical liberty, see pp. 25-32, *infra*, due process does require procedures sufficient to ensure fundamental fairness. In the context of a civil contempt proceeding for non-payment of child support that could lead to confinement, this means procedures adequate to allow a pro se contemnor to attempt to carry his burden of establishing his present inability to pay.

Such procedures may include requiring a non-paying parent to complete an understandable form seeking financial information. South Carolina already requires

---

[9] Although petitioner's submissions below and in this Court have focused on the value of appointed counsel in ensuring that indigent child-support obligors are not erroneously jailed as a means of inducing them to comply with their obligations, see, *e.g.*, Pet. i, Pet. App. 13a, fairly encompassed in those submissions is the proposition that due process demands an appropriate procedure to evaluate an obligor's present ability to pay. See Sup. Ct. R. 14.1(a); *Yee* v. *City of Escondido*, 503 U.S. 519, 534 (1992). In conducting that inquiry, it should be open to the Court to consider whether there are alternative procedures, other than the specific procedure petitioner has proposed, that would satisfy constitutional requirements. To the extent the Court concludes otherwise, however, the proper course would be to dismiss the writ of certiorari as improvidently granted and await a case that expressly raises a broader due process claim.

noncustodial parents to fill out such a form when a support order is originally sought in a Title IV-D case, see S.C. Code Ann. § 43-5-220(c) (West Supp. 2009), but apparently does not do so in subsequent contempt proceedings. Requiring that such forms be completed at the outset of a contempt proceeding would impose little expense on the State or burden on the proceeding while materially advancing the accuracy of the court's determination. Such information could by itself establish the contemnor's present inability to pay his arrears or, conversely, demonstrate his ability to pay. To the extent the court had questions about the information on the form or disbelieved it, the court could question the contemnor about his finances at the contempt hearing. Such simple, minimally burdensome procedures would enable the court to evaluate whether the alleged contemnor has the ability to pay his arrears and is thus an appropriate candidate for a civil contempt sanction.

### 2. *There is no basis for an inflexible right to counsel rule in civil contempt proceedings*

Although the constitutional inadequacy of the family court's procedures could have been cured by appointment of counsel (who presumably would have addressed petitioner's inability to pay his arrears and urged the court not to jail him for that reason), appointment of counsel was not constitutionally compelled.

a. "The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation." *Lujan* v. *G&G Fire Sprinklers, Inc.*, 532 U.S. 189, 196 (2001) (quoting *Cafeteria & Rest. Workers* v. *McElroy*, 367 U.S. 886, 895 (1961)); see *Mathews*, 424 U.S. at 334 ("[D]ue process is flexible and calls for such procedural protections as the particular

26

situation demands.") (brackets in original) (quoting *Morrissey*, 408 U.S. at 481). The question in a due process case is how to ensure a fundamentally fair proceeding, taking into account the importance of the private interest at issue, the risk of error and value of additional procedures, and the government's interest. See *id.* at 335. This is not an inquiry that typically lends itself to the kind of categorical approach advocated by petitioner. See *Gagnon* v. *Scarpelli*, 411 U.S. 778, 789 (1973) (contrasting categorical Sixth Amendment right to counsel in criminal prosecution "with the more limited due process right" in other contexts).[10]

In fact, in areas outside traditional criminal prosecutions where an individual's liberty is nonetheless at stake, the Court has declined to recognize a categorical right to counsel, instead relying on alternative procedural safeguards to ensure due process. See *Gagnon*, 411 U.S. at 782-790; see also *Middendorf* v. *Henry*, 425 U.S. 25, 43 (1976) (no due process right to counsel for summary courts-martial).[11] For example, in *Gagnon*,

---

[10] The Sixth Amendment right to counsel is inapplicable to a civil contempt proceeding because it is not a "criminal prosecution[ ]." U.S. Const. Amend. VI; see *Bagwell*, 512 U.S. at 826-827.

[11] In *In re Gault*, 387 U.S. 1 (1967), the Court recognized a due process right to appointed counsel in a juvenile delinquency proceeding, but, as the Court later explained, that was because the proceeding "while denominated civil, was functionally akin to a criminal trial." *Gagnon*, 411 U.S. at 789 n.12. In *Vitek* v. *Jones*, 445 U.S. 480 (1980), a plurality would have held that there is a due process right to counsel before a State involuntarily transfers a prisoner to a state mental hospital for psychiatric treatment. See *id.* at 497. Justice Powell's controlling concurrence, however, disagreed, concluding that "the fairness of an informal hearing designed to determine a medical issue" does not "require[ ] participation by lawyers." *Id.* at 500. Justice Powell agreed that a prisoner "required assistance" in such a proceeding to ensure

27

the Court held that due process required the government to provide a preliminary and final hearing before it could incarcerate an individual for violating the terms of his probation.  See 411 U.S. at 782; see also *id.* at 785-786 (hearings necessary in order to provide notice of the alleged probation violation and ensure "accurate finding of fact and the informed use of discretion").  At the same time, however, the Court rejected the "contention that the State is under a constitutional duty to provide counsel for indigents in all probation or parole revocation cases." *Id.* at 787; see *id.* at 790 (stating that due process may require appointment of counsel in exceptional cases).  The Court recognized that "such a rule has the appeal of simplicity" but concluded that "it would impose direct costs and serious collateral disadvantages without regard to the need or the likelihood in a particular case for a constructive contribution by counsel." *Id.* at 787.

The Court in *Gagnon* noted that in many cases a probationer's mitigating evidence may be "so simple as not to require either investigation or exposition by counsel." 411 U.S. at 787.  Here too, with the provision of easy-to-understand forms on assets and income and, if necessary, a colloquy with the trial court, it will often be simple for a delinquent child-support obligor to demonstrate his present inability to discharge his obligation without the assistance of appointed counsel.  Indeed, even in criminal cases to which the Sixth Amendment right of counsel applies, defendants are not entitled to government-appointed counsel for the purpose of filling out the forms routinely used to establishing their financial eligibility for government-appointed counsel.  See

---

fairness, but said that it could be "rendered by competent laymen in some cases." *Ibid.*

28

18 U.S.C. 3006A(b) (counsel will be appointed only after court is "satisfied after appropriate inquiry that the person is financially unable to obtain counsel"); *United States* v. *Bauer*, 956 F.2d 693, 695 (7th Cir.) ("Under the Criminal Justice Act, the public fisc need not contribute one penny unless the accused first establishes that he cannot afford counsel. Nothing in the statute directs the Treasury to assist the accused in making this determination."), cert. denied, 506 U.S. 882 (1992). Just as "[n]o legal expertise is needed to participate effectively in hearings under the Criminal Justice Act," *ibid.*, no legal expertise is generally required to establish inability to pay child-support arrears.

*Gagnon* also expressed concern that "[t]he introduction of counsel into a revocation proceeding will alter significantly the nature of the proceeding," since the States typically relied on probation officers to conduct revocation hearings but might turn to attorneys if all probationers were represented. 411 U.S. at 787. "[T]he decisionmaking process will be prolonged, and the financial cost to the State * * * will not be insubstantial." *Id.* at 788. In the context of civil contempt for child support as well, automatic appointment of counsel could delay the proceedings, create an asymmetry in representation between non-custodial parents and custodial parents who may appear pro se, see, *e.g.*, Pet. App. 16a, and impose considerable financial cost on the government without an automatic increase in accuracy.

*Lassiter* v. *Department of Social Services*, 452 U.S. 18 (1981), upon which petitioner relies, see, *e.g.*, Pet. Br. 32-33, is not to the contrary. In that decision, the Court held that there was no due process right to counsel in a parental-rights termination proceeding. See *Lassiter*, 452 U.S. at 32-33. In dictum, the Court said its cases

29

had established a "presumption" that an indigent had a right to appointed counsel "when, if he loses, he may be deprived of his physical liberty." *Id.* at 26-27. The Court has not subsequently relied on any such presumption derived from the *Lassiter* dictum, and *Lassiter* itself recognized that *Gagnon*, which involved a deprivation of physical liberty, had held that "due process is not so rigid as to require that the significant interests in informality, flexibility and economy must always be sacrificed" through appointment of counsel. *Id.* at 31 (quoting *Gagnon*, 411 U.S. at 788).

That there may be atypical cases with "complex factual and legal issues" (Pet. Br. 46) in which counsel would provide a significant benefit beyond what could be obtained through other procedural safeguards does not mean there should be a right to counsel. "[P]rocedural due process rules are shaped by the risk of error inherent in the truth-finding process as applied to the generality of cases, not the rare exceptions." *Walters* v. *National Ass'n of Radiation Survivors*, 473 U.S. 305, 321 (1985) (quoting *Mathews*, 424 U.S. at 344); see *id.* at 331 ("existence of complexity in some cases" was not "sufficient to warrant a conclusion that the right to retain and compensate an attorney in [Veterans Administration] cases is a necessary element of procedural fairness under the Fifth Amendment").

b. A recognition that due process requires fair proceedings before a child-support obligor can be held in civil contempt but that this due process right does not encompass appointment of government-funded counsel is also consistent with the balance struck by Congress and the Secretary in enacting and administering the Title IV-D program. Cf. *Middendorf*, 425 U.S. at 43 ("[W]e must give particular deference to the determina-

30

tion of Congress, made under its authority to regulate the land and naval forces, U.S. Const., Art. I, § 8, that counsel should not be provided in summary courts-martial."); *Walters*, 473 U.S. at 319-320 ("This deference to congressional judgment must be afforded even though the claim is that a statute Congress has enacted effects a denial of the procedural due process guaranteed by the Fifth Amendment.").

Congress and the Secretary have demonstrated their concern that child-support-related proceedings be conducted fairly by repeatedly making compliance with procedural due process rules a requirement of State participation in the program.[12]  At the same time, however, they have declined to reimburse the States for the cost of providing counsel to non-custodial parents. See S. Rep. No. 387, 98th Cong., 2d Sess. 23 (1984) (statute does not provide federal funding for "defense counsel for absent parents" or "incarceration of delinquent obligors"); 45 C.F.R. 304.23 (i) and (j) (no federal funding for "[t]he costs of counsel for indigent defendants in

_____

[12] See, *e.g.*, 42 U.S.C. 666(a)(3)(A) (reduction of non-custodial parents' state income tax refunds to pay overdue support permitted only "after full compliance with all procedural due process requirements of the State"); 42 U.S.C. 666(a)(7)(B)(i) (States must report child-support delinquency to credit bureaus "only after [the] parent has been afforded all due process required under State law, including notice and a reasonable opportunity to contest the accuracy of such information."); 42 U.S.C. 666(a)(8)(B)(iv) (income withholding "must be carried out in full compliance with all procedural due process requirements of the State"); 42 U.S.C. 666(c)(1)(H) (expedited State agency procedures "shall be subject to due process safeguards, including (as appropriate) requirements for notice, opportunity to contest the action, and opportunity for an appeal on the record to an independent administrative or judicial tribunal"); see also 45 C.F.R. 302.70(a)(5)(iii), 303.5(g)(2)(iii), 303.100(a)(6) & (f)(4), 303.101(c)(2), 303.102(c)(1), 303.104(b).

31

IV-D actions" or "[a]ny expenditure for jailing of parents in child-support enforcement cases"); see also 52 Fed. Reg. 32,130 (1987) (Federal "policy since the inception of the [Title IV-D] program has been that costs of incarceration of delinquent obligors and costs of defense counsel are not necessary and reasonable costs associated with the proper and efficient administration of the Title IV-D program.").

Finally, at its broadest, the categorical rule petitioner suggests—that there is a right to government-appointed counsel in all "proceedings denominated as 'civil' where an individual nonetheless faces the prospect of confinement to state custody," Pet. Br. 30—conflicts with Congress's express judgment that provision of government-funded counsel is not warranted in all such areas. See *Middendorf*, 425 U.S. at 43 (deferring to such a judgment); *Walters*, 473 U.S. at 319-320 (same); see also *Landon* v. *Plasencia*, 459 U.S. 21, 34-35 (1982) ("The role of the judiciary is limited to determining whether the procedures meet the essential standard of fairness under the Due Process Clause and does not extend to imposing procedures that merely displace congressional choices of policy.").

For example, while aliens are sometimes detained during removal proceedings or pending enforcement of removal orders, Congress has long explicitly provided that there is no obligation to provide government payment for counsel in such proceedings. See 8 U.S.C. 1362 ("In any removal proceedings before an immigration judge and in any appeal proceedings before the Attorney General from any such removal proceedings, the person concerned shall have the privilege of being represented (*at no expense to the Government*) by such counsel, authorized to practice in such proceedings,

32

as he shall choose.") (emphasis added); 8 U.S.C. 1229a(b)(4)(A). Congress's judgment is consistent with this Court's repeated holdings that removal proceedings are civil and non-punitive, see, *e.g.*, *INS* v. *Lopez-Mendoza*, 468 U.S. 1032, 1038 (1984) ("A deportation proceeding is a purely civil action to determine eligibility to remain in this country, not to punish an unlawful entry, though entering or remaining unlawfully in this country is itself a crime."), and its conclusion that detention of an alien during the removal process is permissible because it is incidental to the proceedings, and not their purpose or goal, see, *e.g.*, *Carlson* v. *Landon*, 342 U.S. 524, 538 (1952) ("Detention is necessarily a part of this deportation procedure."). As the Court has also noted, removal proceedings—whose purpose is removal of aliens from the country, not deprivation of their physical liberty—are "streamlined" administrative proceedings held before administrative personnel, immigration judges, under rules offering the aliens more limited procedural rights than are available in court. *Lopez-Mendoza*, 468 U.S. at 1039; see *ibid.* ("a deportation hearing is intended to provide a streamlined determination of eligibility to remain in this country, nothing more"). The due process guarantee of fundamental fairness does not mandate the appointment of counsel in such proceedings, which would be contrary to the judgment of Congress.[13]

---

[13] For these reasons, the lower courts have held that aliens in removal proceedings have no constitutional right to appointment of counsel at government expense. *United States* v. *Gasca-Kraft*, 522 F.2d 149, 152 (9th Cir. 1975) ("courts have uniformly held in this circuit and elsewhere that in light of the non-criminal nature of both the proceedings and the order which may be a result, that respondents are not entitled to have counsel appointed at government expense") (citing cases); see *Moham-*

33

**CONCLUSION**

The judgment of the Supreme Court of South Carolina should be reversed.

Respectfully submitted.

NEAL KUMAR KATYAL
 *Acting Solicitor General*

TONY WEST
 *Assistant Attorney General*

SALLY A. HOWARD
 *Acting General Counsel*

ROBERT E. KEITH
 *Associate General Counsel*

LISETTE PEDRE MESTRE
 *Attorney*
 *Department of Health and*
  *Human Services*

LEONDRA R. KRUGER
 *Acting Deputy Solicitor*
  *General*

JOSEPH PALMORE
 *Assistant to the Solicitor*
  *General*

LEONARD SCHAITMAN
EDWARD HIMMELFARB
 *Attorneys*

JANUARY 2011

---

*med* v. *Gonzales*, 400 F.3d 785, 793 (9th Cir. 2005); *United States* v. *Torres-Sanchez*, 68 F.3d 227, 230 (8th Cir. 1995); *Nazakat* v. *INS*, 981 F.2d 1146, 1148 (10th Cir. 1992); *United States* v. *Campos-Asencio*, 822 F.2d 506, 509 (5th Cir. 1987).